## SMITH, ETC. AND SHEHAN, ETC. *v.* MARYLAND CASUALTY COMPANY

[No. 318, September Term, 1966.]

*Decided May 2, 1967.*

The cause was argued before HORNEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*Samuel D. Hill,* with whom were *George W. White, Jr.* and *Buckmaster, White, Mindel & Clarke* on the brief for Timothy

D. Smith, one of the appellants; and *John C. Evelius,* with whom were *Tydings, Rosenberg & Gallagher* on the brief for Archbishop, etc., other appellant.

*William B. Somerville,* with whom were *Douglas G. Worrall* and *Smith, Somerville & Case* on the brief for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In July 1960, St. Margaret's Church in Bel Air held its annual bazaar to which the general public was invited. At the "grab bag" stand passers-by were importuned to part with a small consideration for a chance to reach into a large bag and take out a small bag in which would be found one or more trifling items of little value. In the bag withdrawn by Mrs. Sherry Smith was a toy slingshot which she gave to her son, Timothy. Two days later, Timothy, probably while stalking some imaginary monster, in the manner of all small boys since the days of the Piltdown man, drew back on his slingshot to let fly the missile that would bring down his prey. A cruel mischance made him the victim instead. One of the forks of the slingshot broke, snapped back and destroyed his right eye.

Some months later Timothy filed a suit against Francis P. Keough, Archbishop of Baltimore, a corporation sole (the Archbishop), St. Margaret's Church, the pastor of the church, the supplier of the slingshot and the appellee, Maryland Casualty Company (Maryland). The Archbishop tendered the defense of the suit to Maryland, its insurer. Maryland declined the tender, claiming no coverage was afforded by its policy because the accident happened away from the church premises. Three years and some months later the Archbishop (now Lawrence Cardinal Shehan), filed a petition for a declaratory judgment asking the court to construe Maryland's policy "so as to determine whether or not * * * [the Archbishop] is covered by the provisions of the said policy." Timothy was made a party defendant pursuant to Code, Art. 31, A, § 11. The trial judge held that Maryland's policy "does not include within its scope of coverage the said injury suffered by Timothy Smith." Both Timothy and the Archbishop have appealed.

In its policy Maryland agreed "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person, caused by accident and arising out of * * * the ownership, maintenance or use of the premises, and all operations necessary or incidental thereto." An expressly excluded hazard is Division 4—*Products—Completed Operations.* Subsection 1 thereof, which is relevant to the issue before us, follows:

> "(1) Goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division 1 of Item 3 of the declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold."

The first or declarations page of the policy indicates that the only hazard covered is *Premises—Operations.* All other hazards, 5 in number, and including *Products—Completed Operations,* are designated "No Coverage." The premium, $227.86, is clearly applicable to no hazard except *Premises—Operations* and to no coverage except "Bodily Injury Liability." The "schedule" or "supplement" referred to under *Premises—Operations* describes in further detail the areas covered and includes the item "Bingo Games—in public halls or threatres—commercially operated," which, incidentally accounts for $94 of the total premium. The "declarations" page also indicates that the policy is a renewal of an earlier policy and that the agent was T. W. Von Eiff. Mr. Von Eiff testified, six years later, that he was a partner in the firm acting as general agent for

Maryland and that he had been writing insurance for St. Margaret's for some time. He said "normally * * * [he] would not sell *Products—Completed Operations* to a church or similar institution." He said he didn't remember what consideration he gave to the fact that the church held bazaars and that he didn't remember what his "reason was at the time" for not selling that coverage to the church. No one, however, denies that the coverage was available to the church and could have been purchased. Neither is there any suggestion that the church relied on Von Eiff to provide any more coverage than is set forth in the policy. It is agreed that the holding of a bazaar (or carnival) is an operation "incidental" to the use of the church premises and that Maryland would have been obliged to defend the suit had the accident happened on the premises.

Appellants attempt to read into Von Eiff's testimony much more than we have been able to discover in it. His admission, they argue, that he would not normally sell the *Products — Completed Operations* coverage to a church, although recognizing the church might sell things at a bazaar, indicates that there is a distinction between the writing of such a policy for a mercantile enterprise on the one hand and a church on the other. It strikes us that if there is a distinction it is quantitative only. On 16 July 1960 the church was certainly engaged in a mercantile enterprise. A very special kind of enterprise, to be sure—open for business once a year and for a worthy cause —but one which, while in operation, involved the sale of goods to the public. Indeed, Timothy would not have lost his eye if the church had not been engaged in that particular mercantile enterprise. If Von Eiff would not *normally* sell *Products—Completed Operations* coverage to a church, perhaps it ought to be observed that a church *normally* does not sell goods. There is nothing in the record to support the claim that this coverage is "reserved for commercial concerns." It must be assumed, therefore, that anyone wishing to sell goods full-time, part-time or once a year, including a church, can buy the coverage. That only "a few trinkets" are to be sold once a year should not, as claimed by appellants, present any difficulty in determining a premium based on so much per $1,000 of sales. There is always the minimum premium. In fact, the premium for the "bingo"

coverage is $0.263 for each 100 admissions. Appellants claim the exclusion is intended to be limited to those cases where the principal use made of the premises is the sale of goods and that it is inapplicable to sales made in the incidental use of the church premises. As we read the exclusion no such distinction is made. It applies to all sales of goods whether they are incidental to the operation of the premises or a substantial part of whatever business is carried on there.

Appellants insist the bazaar was an operation "incidental" to the use of the premises. Therefore, since the slingshot that injured Timothy was purchased at the bazaar they say there is coverage under the *Premises—Operations* provision. They further insist that, since *Products—Completed Operations* is "reserved for commercial concerns," the reference to it in the exclusionary clause creates an ambiguity which must be construed against the drafter. *New England Mutual Life Ins. Co. v. Hurst,* 174 Md. 596, 199 Atl. 822 (1938). They cite and place great reliance on *McNally v. American States Ins. Co.,* 308 F. 2d 438 (6th Cir. 1962). There the plaintiff was injured in a mishap involving the hotel elevator in which he was a passenger. He claimed McNally failed properly to inspect and to maintain the elevator in a safe working condition as he was required to do under his contract. At the time of the accident McNally was not on the premises. American claimed coverage ceased when McNally left the premises. The *Premises—Operations* provision in *McNally* read, "The ownership, maintenance or use of premises and all operations." In the case at bar the same language is used, but there are added the words *"necessary or incidental thereto."* (Italics supplied.) The court said:

> "Experts, each expressing eminent qualifications in construing terminology used in insurance policies, gave directly opposing opinions as to the meaning of Division 4. Plaintiffs' expert said that the McNallys' coverage for the liability involved was not affected by the exclusion of Division 4. Defendant's experts disagreed. Illustrative of the difficulty that attended an understanding and construction of the insurance contract involved is the fact that the trial of the case de-

veloped some 293 pages of transcript made up of the testimony and arguments devoted to telling the District Judge what the policy meant." *Id.* at 442.

\* \* \*

"All of this [1] adds up to a rather convincing demonstration of the ambiguity which the District Judge found in this insurance contract. We do not take the view that the words *'all operations'* covered 'everything under the sun,' as has been suggested. We are of the opinion, however, that as a minimum they did cover, even with all exclusions indulged, the work of 'elevator inspecting' so clearly written as the subject of the policy." *Id.* at 446. (Emphasis supplied.)

*McNally* is clearly not apposite to the case at bar. There is a crucial difference in the language of the policy and the facts are far from parallel. There is no ambiguity in the case before us and we see no reason why the exclusion should not be given its obvious meaning. *New England, supra.*

That we have not undertaken to burden this opinion with a rehash of all that has been written on the subject of exclusionary clauses and *Products—Completed Operations* provisions in insurance policies means simply that, in our judgment, it is unnecessary. The facts are simple and they are not in dispute. The language of the policy may be technical and not easy to understand but, as we have said, it is free from ambiguity. As stated in 7A Appleman, *Insurance Law and Practice,* § 4508:

"It may be difficult for an untrained layman to understand the nature of coverages written, but that, alone, does not warrant distorting the risks undertaken. Such a layman might not even be aware of the fact that such various coverages are available unless he seeks out the information, even as he might be ignorant of the fact that there are such things as fidelity bonds or contractors' completion bonds. But people in the insurance business, and practitioners of law, ought

---

1. The court is referring to the elaborate dissenting opinion of one of the three judges who heard the appeal.

to be aware of such coverages, their purposes, and their construction. It is scarcely just either to deprive a purchaser of the protection he is entitled to receive or to extend one type of coverage to fit a completely different situation from that contemplated.

"It is apparent that liability under what we ordinarily term 'public liability' coverages can arise fundamentally in three distinct ways. An injury or a loss may result while an activity is in progress, and prior to the completion thereof, either as the result of an act of negligence or an omission. That is what is embraced within the ordinary liability aspect of a public liability policy. But if the operation has been completed, and liability results thereafter either by reason of a defect in merchandise or improper workmanship, that is called 'products liability' or 'completed operations,' the protection of which can be purchased for a premium. Neither type of coverage is intended to supplant the other, nor would the premiums charged be adequate for that purpose."

Since we think the trial judge was correct, his decision will be affirmed. Appellants will pay the costs.

*Judgment affirmed.*
*Appellants to pay the costs.*