68

Swift & Company, a Corporation, Plaintiff-Appellant, v. The London & Edinburgh Insurance Company, Limited, Defendant-Appellee.

Gen. No. 52,795.

First District, Second Division.

September 29, 1970.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (John M. Moelmann and Paul L. Pawlowski, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Richard E. Mueller and R. R. McMahan, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

The parties to this litigation are the insured and the insurer, respectively, under a products liability insurance contract. In a declaratory judgment action brought by the insured against its insurer, the trial court entered a judgment order finding that the London & Edinburgh Insurance Company, Ltd., the insurer, had no duty to defend an action for personal injuries commenced against Swift & Company, its insured. Swift & Company appeals, urging that coverage was provided by its products lia-

bility policy with the defendant and hence, the trial court erred in holding that the insurer had no duty to defend.

This case was submitted to the trial court on the basis of the pleadings, a written stipulation of facts, and the following five exhibits: (1) the products liability policy between the parties which insured against both bodily injury and property damage; (2) the complaint for personal injuries filed against Swift & Company; (3) Swift's operations insurance policy with another insurer; (4) Swift's written contract with A. Cramer and Company; and (5) the defendant insurer's letter to Swift disclaiming coverage under its products liability policy and refusing to defend the personal injury action.

The pleadings and written stipulation indicate that while its products liability policy with London & Edinburgh was in full force and effect, Swift & Company manufactured calcium stearate, a chemical compound, in bulk, at its Chicago soap plant and delivered it to A. Cramer Corporation for further processing. This product was delivered to Cramer only after it had hardened, cooled, broken into lumps, and been packaged by Swift in drums, boxes, or other containers. Although Cramer was given temporary custody of the calcium stearate, title was retained by Swift. In effect, the product was bailed to Cramer for the mutual benefit of both parties.

The services of A. Cramer Corporation were needed because Swift's milling facilities were not equipped to grind calcium stearate to the mesh or fineness required for sale to Swift's customers. A written contract existed between Swift and A. Cramer Corporation under the terms of which Cramer was to grind and package the calcium stearate, for a certain price per pound, and either ship the ground calcium stearate directly to Swift's customers, as directed by Swift, or return it to Swift to be inventoried and eventually sold by Swift from its Chicago plant. During the three-year period covered by the London & Edinburgh policy, Swift sold close to two million pounds of calcium stearate to its customers, all of which was ground by Cramer Corporation, except for two thousand pounds shipped in bulk by Swift to its United Kingdom subsidiary. Calcium stearate in its ground form is

used in the manufacture of dental preparations, cement, and salt.

While a batch of calcium stearate was being ground on Cramer's premises, an explosion and fire occurred injuring two of Cramer's employees who were participating in the grinding process at the time. These employees filed a complaint against Swift & Company in the Circuit Court of Cook County charging Swift with many specific acts of negligence and alleging that the calcium stearate was the cause of the explosion and fire. The calcium stearate being ground at the time of the explosion and fire was to be shipped by A. Cramer Corporation directly to one of Swift's customers.

Swift & Company tendered defense of this suit to London & Edinburgh, who disclaimed coverage and refused to defend on the ground that the accident was not a products liability risk in that, at the time of the explosion and fire, the calcium stearate was a product being manufactured by Swift and hence was not—within the meaning of the words used in the insuring clause—"products or merchandise heretofore or hereafter manufactured, sold or distributed" by Swift & Company. Swift carried operations or public liability insurance with another insurer at the time of this incident.

The insurer's duty to defend in this case depends, of course, upon whether or not the personal injuries alleged in the complaint filed by the two employees of Cramer Corporation were caused by an accident falling within the coverage of the products liability policy. That policy's insuring clause, which is at issue in this case, provides that London & Edinburgh is:

> "To Indemnify the named Assured against loss by reason of the liability imposed by law upon the Assured:—
>
> "(a) on account of bodily injuries, . . . caused, or alleged to have been caused, by accident to any person or persons, . . . and damages, by whomsoever sustained, consequent upon such injuries, . . .

sustained during the period of this Insurance arising out of the possession, consumption, employment, use or handling, . . . elsewhere than upon the premises of the Assured but within the United States of America or the Dominion of Canada, of the products or merchandise heretofore or hereafter manufactured, sold or distributed by the Assured."

In this appeal Swift & Company points out that the term "manufactured" is not defined in the products liability policy and contends that coverage is provided for three alternative reasons: (1) when Swift shipped the bulk calcium stearate to A. Cramer Corporation for further processing which was only to change the form of the stearate and not its basic properties, Swift had completed its manufacturing operations so that, as to Swift, this bulk calcium stearate was a "manufactured product" within the wording of the policy; (2) the use of the words "products . . . hereafter manufactured . . ." in the policy's insuring clause is said to include those products of Swift which are in existence after the policy's inception and which are still in the process of being manufactured so that the accident in this case, alleged to have occurred when the calcium stearate was being manufactured, is within the coverage of this particular products liability policy; and (3) since the policy's insuring clause extends coverage to "products . . . hereafter manufactured, distributed or sold" by Swift and the policy does not define "distributed" nor requires that the product be in a completed form before it can be distributed, Swift had, in fact, distributed the calcium stearate to A. Cramer Corporation at the time of the accident and coverage was provided by the products liability policy.

The insurer contends that: (1) since products liability insurance is intended to protect a manufacturer from liability to third persons after its finished products or manufactured products have entered the channels of trade, whereas the accident in this case occurred when the product was being manufactured, which risk is normally covered by public liability or operations insurance, no coverage is provided by the products liability policy; (2)

when the words "products . . . hereafter manufactured . . ." are considered in the context of the entire sentence in the insuring clause, they are not the equivalent of "products being manufactured" which Swift & Company urges, but rather, their obvious purpose is to provide protection to the insured for all liability arising out of its marketed products no matter when the finished product or manufactured product was made—whether before or after the inception date of the policy; and (3) within the normal and usual context of a products liability policy, the term "distributed" is meant to apply only when a product has been put into the channels of commerce, which did not occur here when Swift & Company did not sell its bulk calcium stearate to A. Cramer Corporation but only delivered it there for grinding as a continuation of Swift's manufacturing operation.

This case is unique in that it does not involve the typical instance of an insurer under a comprehensive public liability or operations policy seeking to avoid coverage due to a "products liability—completed operations" exclusion in the policy (see the cases collected in the annotation at 54 ALR2d 518 et seq.), but rather, we are called upon to consider, not an exclusion in an insurance policy, but the insuring clause itself. Both parties agree that there are no cases in Illinois dealing with the term "manufactured" as employed in a products liability insurance policy. Our independent research has disclosed none, either in this jurisdiction or any other jurisdiction.

The insured asserts that the insuring clause does not require that a product be finished or have completed all possible stages of the manufacturing process before it is deemed "manufactured" or before there is coverage, and if the insurer intended this, it could have so provided by defining the term "manufactured product" which it did not do. It is urged that any ambiguity in this contract should be construed liberally in favor of the insured and against the insurer, citing Pierce v. Standard Accident Ins. Co., 70 Ill App2d 224, 216 NE2d 818 (1966); Sally Chain Stores, Inc. v. Ace Bonded Carriers, Inc., 307 Ill App 644, 30 NE2d 966 (1940); and Ziolkowski v. Continental Cas. Co., 365 Ill 594, 7 NE2d 451 (1937).

In support of its position that coverage was provided since the bulk calcium stearate was a "manufactured product," as far as Swift & Company was concerned, when it was delivered to Cramer Company because the insured had completed its manufacturing operations, Swift & Company relies upon cases having to do with the definition of the noun "a manufacture" or "manufacturing" in taxation or revenue cases (Tide Water Oil Co. v. United States, 171 US 210 (1898) ; Dolese & Shepard Co. v. O'Connell, 257 Ill 43, 100 NE 235 (1912) ; Middletown Iron & Steel Co. v. Evatt, 139 Ohio St 113, 38 NE2d 585 (1941) ; and Commonwealth v. Peerless Paper Specialty, 344 Pa 283, 25 A2d 323 (1942)) and other revenue-producing cases holding that the term "manufactured product" requires a change in essential properties and not a change in form only (Anheuser-Busch Ass'n v. United States, 207 US 556 (1908) ; Commonwealth v. Weiland Packing Co., 292 Pa 447, 141 A 148 (1928) ; and Rieck-McJunkin Dairy Co. v. School Dist. of Pittsburgh, 362 Pa 13, 66 A2d 295 (1949)). We do not find these cited cases to be helpful by analogy. What we are concerned with in the instant case is whether or not the risk insured against by a products liability insurance policy extends to the incident which occurred here. It is undisputed that the accident arose out of the possession, use or handling of the calcium stearate and that it occurred elsewhere than on Swift's premises.

However, we are of the opinion that the parties to a products liability insurance policy or contract do not reasonably intend to have such insurance cover the accident which occurred here where the product must still be regarded as work in process and has not yet become finished goods or entered the channels of trade or stream of commerce. In our opinion, the controlling factor is not that Swift & Company regards bulk calcium stearate as a "manufactured product" because it is done with it, but that it was not yet a finished product from the standpoint of the ultimate user nor had it yet entered the channels of trade or stream of commerce when the injury-producing incident arose. Indeed, the written stipulation of facts indicates that bulk calcium stearate was sold only to Swift's foreign subsidiary and such sales were

negligible. Swift's market was for ground calcium stearate only. It was being ground at the time of the accident preparatory to being placed in the stream of commerce. In our opinion, it was still work in process inventory and was not yet finished goods to which a products liability risk would reasonably attach. Additionally, the accident occurred before the product had been placed in the channels of trade.

The leading cases imposing liability upon the manufacturer on negligence or strict liability theories for defective products (MacPherson v. Buick Motor Co., 217 NY 382, 111 NE 1050 (1916); Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal2d 453, 150 P2d 436 (1944); Henningsen v. Bloomfield Motors, Inc., 32 NJ 358, 161 A2d (1960); Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 377 P2d 897 (1962); and Suvada v. White Motor Co., 51 Ill App2d 318, 201 NE2d 313 (1964); affd 32 Ill2d 612, 210 NE2d 182 (1965)) all had to do with injuries occurring after the defective finished product had entered the channels of trade. After closely examining the policy in this case, we are of the opinion that it covered only those risks arising to the manufacturer after its product had become a finished product in regard to the ultimate user of the product involved in the accident or after the finished good had been placed in the stream of commerce, neither of which had occurred in the case at bar when the injury-producing accident arose.

We find nothing ambiguous in the words "products or merchandise heretofore or hereafter manufactured. . . ." The plain and unambiguous meaning of these words in the context of a products liability policy is that the parties intended by this language to protect the manufacturer against personal injury and/or property damage risks arising from a defective finished product either before or after it had entered the channels of trade. To adopt the insured's first contention would be to ignore the underwriting distinction between a public liability or operations risk and a products liability risk both of which confront a manufacturer. In the treatise on insurance law, 7A Appleman, Insurance Law & Practice, § 4508, the author recognizes this distinction noting

that the former risk has to do with an injury occurring to a nonemployee when a manufacturing activity is in progress and prior to its completion whereas the latter risk concerns itself with completed operations as liability arises from a defect in the merchandise. Insurance premiums charged for protection against each respective risk differ of course. Both Swift & Company and Cramer Company had an insurable interest in the calcium stearate when it was being ground on Cramer's premises since each would enjoy a benefit from the continued existence of the property or would suffer a pecuniary loss from its destruction. Beddow v. Hicks, 303 Ill App 247, 258, 25 NE2d 93, 98 (1940). Swift & Company then could have procured insurance to protect its insurable interest, but in our opinion products liability insurance was not the proper insurance to protect against the type of risk encountered in this case.

■■ Both in 44 Am Jur2d, Insurance, § 1431, and in 1 Couch on Insurance 2d, § 1.85, it is recognized that products liability insurance policies are specifically designed to protect the manufacturer of goods against loss by reason of injury to the person or property of others caused *by the use* of its products. (Emphasis supplied.) It would be an injustice to the insurer to interpret into a policy coverage which the insured has not bought and for which the insurer has not been paid. United States Sanitary Specialties Corp. v. Globe Indemnity Co., 204 F2d 774, 777 (CA 7th Cir 1953).

In Liberty Mut. Ins. Co. v. Hercules Powder Co., 224 F2d 293 (CA 3rd Cir 1955), the court recognized that the very basis of imposing liability upon a manufacturer to the ultimate user for any defective products was to place legal responsibility upon the person who sends goods out *into the channels of trade for use by others.* (Emphasis supplied.) While we recognize that in the cited case the reviewing court held that a products liability exclusion did not apply and that the accident was covered by the insurer's comprehensive general liability policy because the injury-causing instrumentality (i. e., a squared aluminum tube) was held to be equipment owned by the insured and not a product which it had manufactured whereas in the instant case it is undisputed that the al-

leged injury-producing instrumentality was a product manufactured by the insured, the cited case is still helpful to us in attempting to delineate the risks which are reasonably within the coverage of a products liability insurance policy. We hold that the policy in the instant case does not cover the accident which is alleged in the personal injury complaint.

■■ The insured's second and third contentions are answered by the general rules of law, often applied in insurance cases, that if the parties to an insurance contract have used clear and unambiguous language, the words are to be taken in their plain, ordinary and popular sense (Imperial Fire Ins. Co. v. Coos County, 151 US 452, 463 (1894); Bergholm v. Peoria Life Ins. Co., 284 US 489, 492 (1932); Moscov v. Mutual Life Ins. Co., 387 Ill 378, 383–84, 56 NE2d 399, 402 (1944)) and that the rules of construction applied when language employed is ambiguous do not authorize a perversion of language or the exercise of inventive powers for the purpose of creating an ambiguity where none exists or creating a new contract for the parties (Crosse v. Knights of Honor, 254 Ill 80, 86, 98 NE 261, 263 (1912); Zitnik v. Burik, 395 Ill 182, 186–87, 69 NE2d 888, 890 (1946)). In its second contention the insured asserts that the use of the words "products . . . hereafter manufactured . . ." means that the policy includes those products which are in existence after the policy's inception and which are still in the process of being manufactured at the time of any accident whereas in its third contention, Swift & Company contends that the use of the words "products . . . hereafter . . . distributed" by Swift covers the accident involved in the instant case because the insured had distributed the product to Cramer Corporation for further processing before the explosion occurred.

■ In our opinion, these unambiguous words—when taken in their plain, ordinary and popular sense—respectively mean only that the policy will provide protection to the manufacturer-insured for all liability arising out of its marketed products whether the finished product was made before or after the policy's inception date and that the insured would be covered by this policy even if it did not manufacture or sell a finished product

but merely distributed it for itself or for some other manufacturer or seller at the time that an accident occurred off of its premises and which arose out of the possession, consumption, employment, use or handling of the finished product. It will be noted that the language in the insuring clause is in the disjunctive.

■ ■ Furthermore, the act of sending the calcium stearate to Cramer Company for grinding was not a distribution of the product by Swift within the reasonable context of a products liability policy but rather was a continuation of Swift's manufacturing operation. Work in process inventory, within the context of a products liability insurance policy, cannot be reasonably said to be distributed until it has achieved the status of finished goods.

The judgment is affirmed.

Judgment affirmed.

McCORMICK, P. J. and BURKE, J., concur.