Virgil T. STEYER, Jr., et al., Plaintiffs,

v.

WESTVACO CORPORATION, Defendant and Third-Party Plaintiff,

v.

INSURANCE COMPANY OF NORTH AMERICA, and The Hartford Accident and Indemnity Company, and The Home Insurance Company, and Employers–Commercial Union Insurance Company of America, Third-Party Defendants.

Civ. A. Nos. 72–452–M, 72–453–M, 72–560–M and 73–731–M.

United States District Court, D. Maryland.

March 20, 1978.

386

Richard W. Emory and Paul F. Strain and Venable, Baetjer & Howard, Baltimore, Md., for Westvaco Corp.

Donald L. Merriman and Merriman, Crowther & Mann, Baltimore, Md., for Insurance Co. of North America.

Frank J. Vecella and Anderson, Coe & King, Baltimore, Md., for The Hartford Accident and Indemnity Company.

Alva P. Weaver, III, Baltimore, Md., and John P. Arness and Edward F. Glynn, Jr., and Hogan & Hartson, Washington, D.C., for The Home Insurance Company.

Donald C. Allen and Robert L. Ferguson, Jr., Baltimore, Md., for Employers-Commercial Union Ins. Co. of America.

## MEMORANDUM

JAMES R. MILLER, Jr., District Judge.

The question presented in these third-party actions is whether Westvaco Corporation, a defendant in the original suits claiming damages for air pollution, or its insurance companies, third-party defendants, will bear (1) Westvaco's defense costs, al-

legedly $373,232.55, in defending against the original suits, and (2) Westvaco's costs and expenses in litigating its claim against the insurance companies for reimbursement of those costs.[1]

### I Procedural Posture

#### A Motions on the Merits

Westvaco originally filed a third-party complaint and supplements against four insurance companies: Hartford, Employers-Commercial Union, I.N.A., and Home. *See* Papers 12, 59, 61, 180, 181, and 183.

Approximately 29 answers have been filed by the insurance companies to the various complaints, amended complaints and supplemental complaints.

Motions to dismiss the third-party complaint of Westvaco were filed by Hartford (Paper 18), by Employers (Paper 19, 211–214), by I.N.A. (Paper 20), and by Home (Paper 23). An opposition was filed by Westvaco (Paper 24).

The motion to dismiss on behalf of Employers-Commercial Union Insurance Co. was granted (Paper 217, Sept. 15, 1975), and Employers is no longer active in this litigation.

The other motions to dismiss the third-party complaint were, with the consent of counsel, declared moot. *See* Paper 26.

A motion for summary judgment against Westvaco has been filed by the Home Insurance Co. (Papers 200, 248, 250, 202); it has been opposed by Westvaco (Papers 201, 249).

A second motion for summary judgment against Westvaco was filed by I.N.A. (Paper 251); a hearing was requested by Westvaco (Paper 252), but no other memoranda were filed.

A motion for summary judgment in favor of Westvaco against Hartford Insurance Co. was filed (Paper 216) and opposed by Hartford (Papers 246, 247, 253).

The merits of these motions will be discussed below.

#### B Discovery

Initially, the insured Westvaco filed Rule 36 Requests for Admissions against its insurance companies (Paper 186). Formal responses were eventually[2] filed by Hartford (Paper 204), I.N.A. (Paper 205), and Home (Paper 203).

A motion was filed by Westvaco (Paper 207) to determine the sufficiency of those formal responses. At a conference on May 12, 1975, the insurance companies were ordered to designate with particularity the relevant provisions of their respective insurance policies. Such designations were made for Hartford by its letter of May 26, 1975 (Attachment A); for I.N.A. by its letters of May 21 and 27, 1975 (Attachment B); and for Home by its letter of May 22, 1975 (Attachment C). The court will treat these letters as supplemental responses by the parties to the requests of Westvaco Corporation for admissions, and the clerk shall file the letters as Attachments to this Memorandum and Order.

Also at the May 12, 1975, conference, the insurance companies' counsel were instructed to indicate the type of factual evidence that they desired to offer on the issues of liability. Such indications were made for Hartford by letter of June 9, 1975 (Attachment D); for I.N.A. by letter of June 5, 1975 (Attachment E); and for Home by letter of June 6, 1975 (Attachment F). A response was made for Westvaco by letters of June 16 and 20, 1975 (Attachment G). These letters shall be filed as Attachments also.

---

1. Westvaco has included in the total expense of defending against the original suits a $20,000 settlement payment to plaintiffs for consent judgments; $48,676.11 in time and expenses incurred by Westvaco's own employees; $188,-853.81 in attorneys' fees and expenses; and $115,702.63 in consultants' fees. The costs of prosecuting the suit against the insurance companies has not yet been ascertained.

2. A protective order was entered January 8, 1975 (Paper 193), but the court amended the order orally on March 5, 1975, to require answers to the requests for certain limited purposes with particular emphasis on the identification of the relevant policy provisions.

At a conference on June 23, 1975, the insurance companies' counsel were instructed to summarize their expert testimony in accord with Rule 26(b)(4). Such a summary was submitted for Hartford by letter of September 8, 1975 (Attachment H), and for I.N.A. by letter of September 8, 1975 (Attachment I). It appears that no summary was submitted for Home. A reply was made for Westvaco by letter of September 11, 1975 (Attachment J). These letters shall also be filed as Attachments.

Finally, at the June 23, 1975, conference counsel were promised a court interpretation of the policy provision "occurrence" to guide further action in the cases.

## II

On July 10, 1975 (Paper 215), this court ruled on the meaning of the term "occurrence" in the insurance policies of Hartford, I.N.A., and Home. That Memorandum states:

> "Each of the three policies explicitly sets out a definition of the term 'occurrence.' The Hartford policy states that:
>
> > ' "occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in *bodily injury*, or *property damage* neither expected nor intended from the standpoint of the insured;' (emphasis in original).
>
> "The INA policy provides:
>
> > 'OCCURRENCE—"occurrence," as respects property damage means an accident or injurious exposure to conditions, which results, during the policy period in property damage neither expected nor intended from the standpoint of the Insured;'
>
> "The Home policy provides:
>
> > 'The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the

policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.'

> "Under those definitions of the term 'occurrence,' the third-party plaintiffs and the third-party defendants disagree as to whether what must be unexpected or unintended in order for the insured to recover under the policy are the emissions from the Westvaco plant or the damage of the type complained of by the plaintiffs. After consideration of the policy provisions and the arguments presented by counsel for the respective parties, it is the opinion of this court that the words 'unexpected or unintended' or words of similar import in all three policies with respect to the definition of 'occurrence' do not refer to unknown, unexpected, or unintended emissions from the Westvaco plant, but instead refer to unknown, unexpected, and unintended damage of the type complained of by the plaintiffs. All further proceedings in the third-party actions of Westvaco Corporation will be conducted based upon said meaning."

See *Grand River Lime Co. v. Ohio Casualty Ins. Co.*, 32 Ohio App.2d 178, 289 N.E.2d 360, 364–65 (1975); *Aetna Casualty & Surety Co. v. Martin Bros. Container & Timber Products Corp.*, 256 F.Supp. 145, 149–50 (D.Ore.1966); McGeough, *The Applicability of Liability Insurance Coverage to Actions Involving Environmental Damage*, 1971 A.B.A. Section on Ins., Neg. & Comp. Law Proceedings 312, 318–19 (1971). *Cf. Aerial Agricultural Service of Montana, Inc. v. Till*, 207 F.Supp. 50, 55–59 (N.D.Miss.1962).

## III

The task now before the court is to apply the definition of "occurrence" to the three pending motions for summary judgment. Preliminarily, the court will review the law governing an insurance company's duty to defend its insured.[3]

---

**3.** The parties have assumed either that the substantive law of Maryland governs in this diversity jurisdiction case or that the substantive law of other potential forums does not differ

*A Duty to Defend*

An insurance company's duty to defend is separate and distinct from the company's duty to pay a resulting judgment. *See, e. g., Employers Mutual Liability Ins. Co. v. Hendrix*, 199 F.2d 53 (4th Cir. 1952); *Riviera Beach Volunteer Fire Co. v. Fidelity & Casualty Co. of N. Y.*, 388 F.Supp. 1114, 1120 (D.Md.1975); *Kelly v. Phoenix Assurance Co.*, 225 F.Supp. 562, 564 n.3 (D.Md.1964); 7A J.A. Appleman, *Insurance Law and Practice* § 4682 (1962 ed.) [hereinafter Appleman]; Annot., 50 A.L.R.2d 458 (1956). The company's preliminary duty to defend and its ultimate duty to pay a judgment are related in that both in the last analysis depend on the scope of coverage under the policy. *See id.*

In order to determine whether the insurer has a duty to defend a suit against the insured, the insurance policy provisions governing coverage and the duty to defend must generally be compared to the allegations of the complaint against the insured. *See Hendrix, supra; Riviera Beach, supra*; Appleman § 4683; Annot., 50 A.L.R.2d 458 (1956). In contrast, the question whether the insurer has a duty to pay a final judgment against the insured turns on a comparison of the ultimate findings of fact concerning the alleged occurrence with the policy coverage. *See American Casualty Co. v. Denmark Foods, Inc.*, 224 F.2d 461, 464 (4th Cir. 1955).

Once it is determined that the insurance policy creates a duty to defend against claims made within the policy's coverage and it is further determined that the complaint alleges a cause of action within the policy's coverage, the company is obligated to defend the suit, notwithstanding alternative allegations outside the policy's coverage, until such time, if ever, that the claims have been limited to ones outside the policy coverage. *See, e. g., Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975) (implicit); *Hendrix*, 199 F.2d at 56–

57; *Bundy Tubing Co. v. Royal Indemnity Co.*, 298 F.2d 151, 154 (6th Cir. 1962).

*B Hartford*

Third-party plaintiff Westvaco moves for summary judgment on its contention that Hartford is liable for breach of its contract to defend Westvaco against suits alleging claims covered by the policy.

The Hartford-Westvaco policy provides, in part:

". . . the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

The phrase "to defend any suit against the insured *seeking* damages on account of such . . . property damage" establishes that, as is the general case, Hartford's duty to defend is governed by the allegations of the complaint against the insured. The words "on account of such . . . property damage" refer back to the dual qualification of "property damage" in the policy that such property damage claimed to have been caused must be the type of damage "to which this insurance applies" and it must have been allegedly "caused by an occurrence."

As to the first requirement that the property damage be of the type "to which this insurance applies," the court has read the policy provisions designated by the parties as relevant in the Request for Admissions in Hartford's letter of May 26, 1975 (Attachment A), and in Westvaco's letter of June 2, 1975 (Attachment D). There is no pollution exclusion endorsement or other provision which purports to make this insurance policy inapplicable to the kind of property damage alleged here.

As to the second requirement that the property damage must have allegedly been

---

materially. *See generally Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Riviera Beach Vol. Fire Co., Inc. v. Fidelity & Casualty Co. of N. Y.*, 388 F.Supp. 1114, 1119 (D.Md.1975); *Md.Cts. & Jud.Proc. Code Ann.* § 10–504 (1974).

"caused by an occurrence," in order to reach a decision one must compare the policy's definition of "occurrence," interpreted above, with the allegations of the plaintiff's complaint against the insured. As heretofore enunciated, the policy term "occurrence" means an accident, including injurious exposure to conditions, resulting in property damage, which damage is neither expected nor intended by the insured. In the original complaints filed against Westvaco, plaintiffs Steyer, Custer, Taylor, and Stacy alleged that Westvaco's Luke, Maryland pulp mill discharged polluting substances into the air resulting in damage to the plaintiffs' Christmas tree crops during the period from approximately 1969 through 1972 and 1973, when the original suits were filed. The plaintiffs' claims for relief were based on four legal theories: (1) continuing nuisance, (2) trespass, (3) negligence, and (4) strict liability for creating "an unreasonably dangerous and harmful situation."

■ Insofar as the original complaints rested on negligence, a nuisance created negligently, or a negligently committed trespass,[4] they alleged that plaintiffs' Christmas trees were damaged because of an injurious exposure to polluting conditions resulting in property damage which was neither expected nor intended by the insured. Thus the original complaints against the insured Westvaco alleged claims within the policy coverage,[5] and the insurer was obligated to defend, provided the other relevant policy terms were satisfied relating to the date of policy coverage and to notice.

■ The period of time during which Hartford insured Westvaco began on December 15, 1970. See Request for Admissions, Paper 186, ¶ 3, and Response, Paper 204, ¶ 3. When Hartford's policy terminated is not clearly established, although Hartford's counsel suggests it might have been a three-year policy. See Letter of May 26, 1975, at 5. For purposes of determining the fact of Hartford's liability to Westvaco (as opposed to the dollar amount of its liability), it is sufficient that there is some overlap between the coverage period beginning December 15, 1970, and the period during which the damage is alleged to have occurred, which was prior to July 19, 1973, as to Stacy; prior to May 31, 1972, as to Taylor; and prior to May 3, 1972, as to Custer and Steyer. See Complaints and Amended Complaints; Md.Cts. & Jud.Proc. Code Ann. § 5–101 et seq. (limitations). In further proceedings on the amount of money owed to Westvaco by Hartford, counsel may explore whether apportionment of the defense expenses is appropriate.

■ The insurance policy requires that the company be notified "as soon as practicable" in the event of an occurrence and suit. The affidavit of Donald C. Smith, an officer of Westvaco, sets out the steps taken to notify the insurance companies of the pending claim. (See Ex. 1 to Westvaco Motion, Paper 216). The affidavit is uncontradicted. The four original complaints against Westvaco were filed on May 3 (two) and May 31, 1972, and July 19, 1973. The affidavit establishes that the insurers' agents were notified by letter dated May 30 and June 8, 1972, of the suits and that subsequent letters supplied copies of the initial pleadings as required. There is no genuine dispute as to those facts, and, after comparing the facts to the pertinent policy provision, this court concludes that the notice requirements of the policy were satisfied by Westvaco.

■ Hartford has further contended that, irrespective of the terms of the policy, it has no liability under the "duty to defend" portions of the policy because of an alleged conflict of interest between itself as the insurer and Westvaco as the insured.

---

4. Liability for trespass or nuisance may be based on either willful or negligent acts. See W. Prosser, Law of Torts § 13, at 64, § 87, at 575 (1971); Second Restatement of Torts § 166; Whitehall Construction Co. v. W. S. S. C., 165 F.Supp. 730 (D.Md.1958).

5. As discussed infra, it is necessary only that some allegations be within the policy coverage. See Brohawn v. Transamerica Ins. Co., 276 Md. 396, 347 A.2d 842 (1975).

In Maryland, however, it is now settled that an insurance company is not excused from its contractual duty to provide a defense to the insured by the existence of a conflict of interest between the insured and the insurer over the conduct of the defense. *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407–14, 347 A.2d 842 (1975), *rev'g* 23 Md. App. 186 (1974).

In *Brohawn*, the Maryland Court of Appeals addressed an issue similar to the one here:

" . . . Transamerica argues that if it were to defend its insured under the circumstances here, it would be placed in the 'untenable position' of attempting to cooperate in the defense of the action with its insured even though its interests are in fact adverse. This conflict of interests can best be described as follows. . . . But if Mrs. Brohawn were to be held liable for damages resulting from her efforts to remove her grandmother from the nursing home, the interests of the insurer and insured would diverge. Mrs. Brohawn would want a finding that liability is based upon her negligent conduct, obligating the insurer to indemnify within policy limits. The insurer, on the other hand, would desire a finding that the injuries were caused by the insured's intentional conduct, thus releasing it from any duty to indemnify under the policy exclusion. . . . Transamerica concludes that this situation would be unfair and prejudicial to both parties, and that it should therefore be relieved of the obligation to defend its insured."

*Id.* at 409, 347 A.2d at 851. The Court of Appeals said:

"We hold that an insured is not deprived of his contractual right to have a defense provided by the insurer when a conflict of interest between the two arises under circumstances like those in this case. When such a conflict of interest arises, the insured must be informed of the nature of the conflict and given the right either to accept an independent attorney selected by the insurer or to select an attorney himself to conduct his defense. If the insured elects to choose his own attorney, the insurer must assume the reasonable costs of the defense provided."

*Id.* at 414–415, 347 A.2d at 854.

Westvaco has also argued that Hartford is bound by a stipulation in the consent decree between Westvaco and the respective original plaintiffs that Westvaco caused no damage to the Christmas trees of the plaintiffs. The purpose of Westvaco's argument is to categorize the $20,000 settlement payment as "litigation expenses," which might be recovered under the duty to defend clause, as opposed to "damages" which can be recovered by Westvaco only if, in fact, the policy covered the claim for which the payment was made to the plaintiffs. No persuasive authority has been presented *pro* or *con* on this argument and the court reserves judgment on it pending further memoranda from the parties.

■ Hartford also urges that its liability for breach of its duty to defend can not be determined without a finding of fact after trial on whether Westvaco expected or intended to cause damage to the plaintiffs' Christmas trees. Such a finding would be necessary before the court could determine Hartford's liability under the policy for any damages caused by Westvaco. *See, e. g., Hendrix, supra.* However, when the issue is whether the allegations against the insured triggered the insurance company's duty to defend "*any suit against the insured seeking damages,*" such a finding of fact is not necessary since the existence of the "duty to defend" depends on the allegations of the complaint against the insured. Because there is no genuine issue of fact involving the allegations by the original plaintiffs or the pertinent policy provisions, summary judgment on the issue of liability on the "duty to defend" should be granted in favor of Westvaco.

*C Insurance Company of North America*

I.N.A. has moved for summary judgment on the ground that I.N.A.'s policies [6] do not

---

**6.** LAB–16354, LAB–16389, LAB–21625.

insure Westvaco against third-party property damage caused by air polluting emissions from Westvaco's plant nor create any "duty to defend" on the part of I.N.A. as to its insured, Westvaco, from any such claims. I.N.A.'s argument relies, not on an interpretation of the word "occurrence," but on the limiting language of coverage D. Westvaco has responded to the INA motion (Paper 251) only with a request for a hearing (Paper 252) but no written memorandum.

The I.N.A. policy provides coverage as follows:

"INA will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

personal injury or

*property damage, as hereinafter provided, to which this insurance applies, caused by an occurrence.*"

(Emphasis added). For the reasons given in Part II, *supra*, this court has concluded that negligently caused damage to plaintiffs' Christmas tree farms would be an "occurrence" within the meaning of these three insurance contracts. As the interpretation of the "occurrence" term has been decided adversely to it, I.N.A. relies on the second condition of the coverage clause: that the property damage must be one, "*as hereinafter provided, to which this insurance applies.*"

Coverage under the I.N.A. policies was provided in four parts, A, B, C, and D. Coverages A and B relate to personal injury and property damage by an automobile, and coverage C relates to other personal injury. Only coverage D might apply here: "property damage, other than automobile (as per declarations)." The coverage clause provides:

"With respect to Coverage D insurance shall only apply as respects leased premises, products and completed operations and the operation of watercraft and mobile equipment as afforded by the policy."

Paper 186, at 4; Attachment B. Under coverage D, insurance is provided for property damage arising from only four situations: (1) "leased premises," (2) "products and [(3)] completed operations," and (4) "the operation of watercraft and mobile equipment." [7]

Neither the original plaintiffs' complaints nor Westvaco's third-party complaint suggest that the claims here resulted from the hazards identified as "automobile," "leased premises," or "operation of watercraft and mobile equipment." Therefore, in order for Westvaco to prevail on its breach of duty to defend claim, the complaints by the Christmas tree farmers against Westvaco must allege claims for property damage from the "products and completed operations" hazards insured against by the INA coverage D. [8]

### (1) Products Hazard

Although the I.N.A. policy does not define the term "product" *per se*, the policy definition of "products hazard" [9] reveals that "product" refers to the physical objects

---

7. The difference between the general language in the Hartford policy, *see* Paper 186, at 5; Attachment A, and the more detailed language of the I.N.A. policy is remarkable, *see* Paper 186, at 4; Attachment B.

8. I.N.A.'s duty to defend arises from its policy coverage provisions:

"INA shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but INA shall not be obligated to pay any claim or judgment or defend any suit after the applicable limit of INA's liability has been exhausted by payment of judgments or settlements."

*See* Paper 186, at 5; Attachment B.

9. The policy definition is:

"PRODUCTS HAZARD—'products hazard' includes personal injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others;"

Attachment B, Policy LAB–21625, at 12.

which the insured, for example, manufactures and transfers to others as the insured's stock-in-trade. *See Smith v. Maryland Casualty Co.*, 246 Md. 485, 229 A.2d 120 (1967) (interpreting a "Products-Completed Operations" coverage which a church had failed to purchase for the goods sold at a church carnival); 7A *Appleman* § 4508 (1961, 1974 Cum.Supp., 1976 Supp.); *Merriam-Webster New International Dictionary* 1810 (3d ed. 1966) (product). *Cf. Swift & Co. v. London & Edinburgh Ins. Co.*, 130 Ill.App.2d 68, 264 N.E.2d 389 (1970); *Finn v. Employer's Liability Assur. Corp.*, 141 So.2d 852 (La.App.1962).

█ I.N.A. was not obliged under its "products hazard" coverage to defend Westvaco against the Christmas tree farmers' air pollution complaints because the air pollution injury alleged can not reasonably be said to have resulted from any physical objects which constituted the stock-in-trade of Westvaco.

*(2) Completed Operations Hazard*

Under the I.N.A. policies the "completed operations hazard," is defined as follows:

"COMPLETED OPERATIONS HAZARD —'*completed operations hazard' includes* personal injury and *property damage arising out of operations* or reliance upon a representation or warranty made at any time with respect thereto, *but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured.* 'Operations' include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

"(a) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed,

"(b) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or

"(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

"Operations which may require further service of maintenance work or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

"The completed operations hazard does not include bodily injury or property damage arising out of:

"(a) Operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

"(b) the existence of tools, uninstalled equipment or abandoned or unused materials;"

(Emphasis supplied). Attachment B, Policy LAB–21625, at 10–11.

█ The "completed operations hazard" definition in this policy is strikingly different from the manner in which the damages to the farms of the plaintiffs are alleged to have been caused. In the amended Steyer Complaint, for example, it is alleged that the Westvaco plant "is so equipped as to cause large amounts of air pollution to be emitted into the ambient air" to the extent of "approximately 27,000 tons per year." Such allegations, it is clear, charge that the offending pollutants are caused by the defendant Westvaco's ongoing, day-to-day operation of its paper mill. While the allegation of Christmas tree damage does fall within the "operations" aspect of the insured's hazard, the allegation of Christmas tree damage from the ongoing, day-to-day paper mill generated pollution is not an allegation of "property damage [occurring] after such operations have been completed or abandoned." The damages to the Christmas trees alleged in the complaints plainly

resulted from the ongoing "operations" of the Westvaco paper mill, a hazard not insured by I.N.A.[10]

This conclusion on where to draw the line between "operations" and "completed operations" is consistent with the conclusions drawn by other courts construing language not materially different from the language in the I.N.A. policy here. *See, e. g., Insurance Co. of North America v. Bosworth Construction Co.*, 469 F.2d 1266 (5th Cir. 1972) (steel superstructure of hotel); *Home Indemnity Co. v. Miller*, 399 F.2d 78 (8th Cir. 1968) (home construction); *Hoffman & Klemperer Co. v. Ocean Accident & Guarantee Corp.*, 292 F.2d 324 (7th Cir. 1961) (building clearing); *Roberts v. P. J. Boat Service, Inc.*, 357 F.Supp. 729 (E.D.La.1973) (engine repair); *Nielson v. Travelers Indemnity Co.*, 174 F.Supp. 648 (N.D.Iowa 1959) (excavation contractor).

Under the "completed operations" hazard coverage, therefore, I.N.A. was not obliged to defend Westvaco.

### (3) Hearing

Local Rule 6 requires that memoranda in opposition to a motion be filed within 10 days. As to I.N.A.'s motion, no memorandum has been filed by Westvaco, although a request for a hearing was filed. As the court believes no hearing is necessary, none will be held.

I.N.A.'s motion for summary judgment will be granted.

### D Home

Home Insurance Company has moved for summary judgment against Westvaco on

the ground that its contracts of insurance disclaim any duty to defend and that it owes a duty to reimburse Westvaco for defense expenses only if the expenses are paid as a result of an "occurrence" and if they are not covered by other valid and collectible insurance.

In addition, Home has filed a supplemental motion for summary judgment against Westvaco on the ground that Westvaco's stipulation with the plaintiff Christmas tree farmers that it did not cause any damage at issue on this case precludes Westvaco from alleging and proving that there was in fact damage, an asserted condition precedent to payment under Home's policy.

### (1) Duty to Defend

Unlike Hartford and I.N.A., Home provided in its insurance contract with Westvaco that:

"The Company [Home] shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured . . ."

Attachment C, at 6, *quoting* Manuscript Excess Liability Policy ¶ H. Accordingly, Home had no duty to defend Westvaco. *See* authorities cited in Part III, A, *supra.*

One significant consequence of this ruling that there is no duty to defend is to make inapplicable the rule in a duty to defend situation that the liability of the insurer to defend is determined by comparison of the allegations in the complaint against the insured with the terms of the insurance poli-

---

**10.** Public liability coverages have been classified into three categories:

"It is apparent that liability under what we ordinarily term 'public liability' coverages can arise fundamentally in three distinct ways. An injury or a loss may result while an activity is in progress, and prior to the completion thereof, either as the result of an act of negligence or an omission. That is what is embraced within the ordinary liability aspect of a public liability policy. But if the operation has been completed, and liability results thereafter either by reason of a defect in merchandise or improper workmanship, that is called 'products liability' or

'completed operations', the protection of which can be purchased for a premium. . . .

"Then there is a third possible type of loss—and that is damage to the product itself. . . .
7A *Appleman* § 4508, at 98.

The accuracy of this classification is illustrated by the I.N.A. policy's treatment of "products and completed operations" as one grammatical phrase, by *Smith v. Maryland Casualty*, 246 Md. 485, 229 A.2d 120 (1967), and by the treatment given to "completed operations" provisions in the numerous cases cited *supra.*

cy. See authorities cited in Part III, A, *supra.*

### (2) Home's Liability to Westvaco

The insurance contract between Home and Westvaco provides that Home Insurance Company will pay on behalf of Westvaco all sums which Westvaco is obligated to pay by reason of a liability imposed by law or by contract for damages or expenses further defined as "ultimate net loss," on account of property damage "caused by or arising out of each occurrence. . . ." Attachment C, at 2, quoting Manuscript Excess Liability Policy, Part I Coverage.[11]

This portion of the agreement by its terms apparently provides that the insurer is liable to indemnify the insured on the two conditions that there is property damage and that it is caused by or arises out of an occurrence.

A third apparent condition to Home's liability under the policy is created by the definition of "ultimate net loss."[12] Home is not liable for expenses as aforesaid "when such expenses are included in other valid and collectible insurance." Attachment C.

The significance of these three apparent conditions to liability by Home and its summary judgment motion will be discussed in turn.

### (a) Property Damage

Home contends that Westvaco's agreement with the plaintiffs that it had done no property damage to plaintiffs' Christmas

---

11. The Home policy provides:
    "I Coverage
    "The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the insured for all sums which the insured shall be obligated to pay by reason of the liability
    "(a) imposed upon the insured by law, or (b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,
    for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:—

trees precludes Westvaco from asserting that there was property damage in order to take advantage of the excess liability coverage in the Home policy. Two questions are raised by this argument. First, does the insurance policy require as a condition precedent to the insurer's liability that there be property damage in fact? Second, does the agreement and resulting consent judgment between defendant Westvaco and plaintiff Christmas tree farmers bind third-party plaintiff Westvaco in its third-party complaint against its insurer Home?

In at least two places, the Westvaco-Home insurance policy contains language that can reasonably be construed only as requiring that there in fact be property damage as a condition precedent to liability on account of alleged property damage. The coverage paragraph provides in part:

> "The Company hereby agrees . . . to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability
>
>     \*    \*    \*
>
> "for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:—
>
>     \*    \*    \*
>
> "(ii) Property Damage
>
>     \*    \*    \*
>
> "caused by or arising out of each occurrence happening anywhere in the world."

---

    (i) Personal Injuries, including death at any time resulting therefrom,
    (ii) Property Damage,
    (iii) Advertising Liability,
caused by or arising out of each occurrence happening anywhere in the world."
The phrase "pay on behalf of" is substituted for "indemnify" by Endorsement No. 18, effective Nov. 1, 1969. Attachment C.

12. The Home policy definition of "ultimate net loss" provides in part:
    "The Company shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance."
    Attachment C, at 5.

Attachment C, at 2. (For complete text, see *supra*). The language "liability . . . for damages . . . on account of . . . property damage . . . caused by or arising out of each occurrence" makes property damage a condition of the insurance company's liability. This construction is reinforced by the policy's definitions of an "occurrence" [13] and of "property damage." [14] The term "occurrence" means "an . . . event . . . which . . . results in . . . property damage . . . .." The term "property damage" means, *inter alia*, "direct damage to or destruction of tangible property."

Westvaco's argument that property damage is not a condition to policy coverage relies on excerpts from the policy's definition of "ultimate net loss." [15] Westvaco asserts that under the "ultimate net loss" definition, "the Home Insurance Co. is obligated to indemnify the insured for the total sum the insured is obligated to pay by reason of '*claims*, either through adjudication or compromise.'" Westvaco Memorandum, Paper 249, at 2. Although superficially plausible, the argument fails for two reasons. First, the corollary of the argument would be that the insurance company would be liable for defense costs whenever property damage is alleged, but not found. In effect, such a construction would amount to a duty to defend even though that duty is expressly disclaimed by the policy. Second, one dictionary definition of "claim" is "a demand for compensation, benefits, or payment . . . as one made under an insurance policy upon the happening of the contingency against which it is issued." *Webster's Third New International Dictionary* 414 (1966). Even the definition of "claim" includes a reference to the happening of the insured event, namely, property damage.

When the excerpts cited by Westvaco are considered in the context of the entire definition of "ultimate net loss", of the definition of "claim" and of the remaining policy terms, the policy interpretation urged by Westvaco is untenable. Under the insurance policy, Home is liable only if in fact there was property damage.

The second question is whether the agreement and consent judgment between defendant Westvaco and plaintiff tree farmers binds third-party plaintiff Westvaco in its complaint against its insurer Home. In the agreements and consent judgments with the four plaintiffs (Papers 167–170), it is provided:

> "With the consent of Plaintiff noted below, it is this 5th day of April 1974
>
> "ADJUDGED, ORDERED AND DECREED that judgment in this case be entered against Plaintiff and in favor of Defendant Westvaco on the issue of liability, it being agreed by Plaintiff that Defendant Westvaco did not cause and is not responsible for any of the damages for which Plaintiff seeks recovery."

13. "The term 'occurrence' wherever used herein shall mean an accident or a happening or event or a continuance or repeated exposure to *conditions which unexpectedly and unintentionally results in* personal injury, *property damage* or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

(Emphasis supplied). Attachment C, at 4.

14. "The term 'Property Damage' wherever used herein shall mean loss of or *direct damage to or destruction* of tangible property (other than property owned by the Named Insured)."

(Emphasis supplied). Attachment C, at 4.

15. "Ultimate Net Loss" is defined in part as:

"The term 'ultimate Net Loss' shall mean the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Insured's or of any underlying insurer's permanent employees." Attachment C, at 5.

In its memorandum, Westvaco agrees that the consent judgments establish that there was no damage, and it raises no objection to Home's assertion that the consent judgment binds Westvaco here. *See* Westvaco Memorandum, Paper 249, at 1.

The doctrines of *res judicata* and collateral estoppel are often applied to forestall round-robin litigation of issues involving a defendant insured, his insurer, and the insured plaintiff. *See, e. g., Breeland v. Security Ins. Co.,* 421 F.2d 918 (5th Cir. 1969); *Union Ins. Soc. of Canton, Ltd. v. William Glucken & Co.,* 353 F.2d 946 (2d Cir. 1965); *Glens Falls Ins. Co. v. American Oil Co.,* 254 Md. 120, 254 A.2d 658 (1969); 20 *Appleman* § 11521. Maryland follows "[t]he old and still generally prevailing rule . . . that a judgment by consent is as sound a base on which to ground collateral estoppel as a judgment after an adversary trial." *Travelers Ins. Co. v. Godsey,* 260 Md. 669, 676, 273 A.2d 431, 435 (1971). *See generally, MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977); *Frontier Van Lines v. Maryland Bank & Trust Co.,* 274 Md. 621, 623, 336 A.2d 778 (1975).[16]

Under the April, 1974, consent decree and the law of Maryland, the defendant and third-party plaintiff Westvaco is precluded from now contending in these suits that its actions did, in fact, cause damage to the plaintiffs' Christmas tree farms. Accordingly, the defendant Home Insurance Company's motion for summary judgment will be granted.

### (b) Caused By An Occurrence

Because the definition, *supra*, of the term "occurrence," refers expressly to "an accident . . . which . . `. results in . . . property damage," Westvaco's legal preclusion from establishing that there was any property damage results in an inability to establish that there was an "occur-

rence"—a prerequisite to liability on the part of Home. *See* Attachment C, at 2, quoting from Manuscript Excess Liability Policy, Part I, Coverage.

### (c) Other Insurance

Assuming that Home were liable to some extent under the policy, its liability would be limited, *inter alia*, to those expenses not covered by "other valid and collectible insurance." Attachment C, at 5 (definition of "ultimate net loss"), *supra*. Determination of this overlap would have to await the resolution of claims against the general liability insurers. However, because there can be no liability on behalf of some, this proffered reason for withholding decision is moot.

For all of these reasons, the motions of Home Insurance Company for summary judgment will be granted.

### IV

Further proceedings in this case shall be conducted on the following schedule. As the summary judgment motions of I.N.A. and Home have been granted, only the Westvaco-Hartford dispute remains.

Within thirty (30) days from the date of this Memorandum, Westvaco shall file a motion for summary judgment and affidavits on the issue of the amount of damages for which Hartford is liable.

Within sixty (60) days thereafter, Hartford shall have completed all additional discovery and responded to the motion for summary judgment.

A hearing on the motion will be scheduled if necessary.

---

16. As noted and rejected by the *Godsey* court, some cases and commentators urge that a judgment by consent be given more limited *res judicata* or collateral estoppel effect than a judgment after a trial. *See, e. g.,* 1B *Moore's Federal Practice* ⸢ 0.444[3].

Rules governing application of *res judicata* are a matter of substantive law as to which a district court in a diversity case must apply the law of the state in which it sits. *E. g., Groves v. Associated Transport, Inc.,* 344 F.2d 894, 896 (4th Cir. 1965).