J. ARON AND COMPANY, INC., to its own use and to the use of the Home Insurance Company, Plaintiff,

v.

SERVICE TRANSPORTATION COMPANY, Defendant and Third-Party Plaintiff,

v.

FIREMAN'S FUND OF AMERICA, INC. and Paul Arnold Associates, Inc., Third-Party Defendants, Counter-Claim.

PAUL ARNOLD ASSOCIATES, INC., Fourth-Party Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY, Fourth-Party Defendant.

FIREMAN'S FUND INSURANCE COMPANY, Plaintiff,

v.

SERVICE TRANSPORTATION COMPANY, Defendant and Third-Party Plaintiff,

v.

PAUL ARNOLD ASSOCIATES, INC., Third-Party Defendant and Fourth-Party Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY, Fourth-Party Defendant.

Civ. Nos. HM77–1542, HM77–2003.

United States District Court, D. Maryland.

May 11, 1981.

 

Francis J. Gorman, James W. Bartlett, III, and Semmes, Bowen & Semmes, Baltimore, Md., for J. Aron & Co., Inc.

Marvin J. Land, Dana N. Pescosolido and Weinberg & Green, Baltimore, Md., and Gordon S. Freesman and Harber & Freesman, Fort Lee, N. J., for Service Transp. Co.

Donald L. Merriman, Michael B. Mann and Merriman, Crowther & Merriman, Baltimore, Md., for Fireman's Fund Ins. Co.

Louis G. Close, Jr., Larry M. Waranch, and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., for Paul Arnold Associates, Inc.

## MEMORANDUM

MURRAY, District Judge.

The factual genesis of these consolidated lawsuits was the loss of four truckloads of coffee beans in a fire which occurred on June 27, 1977 at the Kresson Street terminal in Baltimore of Service Transportation Co., ("Service"), a corporation engaged in the business of transporting freight for hire as a common carrier. The owner of the coffee beans, J. Aron and Co., Inc. ("Aron"), filed suit in Civil No. 77–1542 to recover damages from Service for the fire losses, and Service impleaded its insurance carrier, Fireman's Fund Insurance Co. ("F.F.") and the insurance broker who procured and prepared the Fireman's Fund policy, Paul Arnold Associates, Inc. ("Arnold"). On May 1, 1977 F.F. had issued a policy of insurance to Service which Service claimed provided coverage for the fire loss. To resolve the issues of policy coverage, which centered around the meaning of the policy language "while in the custody or control of the insured . . . in the ordinary course of transit," F.F. instituted Civil No. 77–2003, seeking a declaratory judgment that the loss was not covered by its policy issued to Service. F.F. won the declaratory judgment action when this court, by opinion of the late Judge Blair dated March 13, 1979, ruled on cross motions for summary judgment that the insurance policy covered only "in transit" losses and that the coffee, which had been under Federal customs detention at Service's Kresson Street terminal for approximately three weeks, was no longer "in transit." *Fireman's Fund Ins. Co. v. Service Transportation Co.*, 466 F.Supp. 934 (D.Md.1979).[1]

In June of 1977 Judge Blair had bifurcated the trial of the main case, No. 77–1542,

---

1. Arnold was also a third-party defendant in the declaratory judgment action, Civil No. HM77–2003. The third-party complaints originally filed in both 77–1542 and 77–2003 were based on allegations that Arnold undertook to obtain coverage that would exactly duplicate coverage previously provided to Service by Home Insurance Co. Home's policy provided coverage to Service's warehousing activities as well as its transportation activities.

This complaint against Arnold has been amended to add an allegation that Arnold, while procuring insurance, was acting as agent for Service and that its failure to procure the proper coverage constituted negligence and a breach of both its contract with Service and its duty of due diligence.

to consider first Aron's basic liability claim against Service and only at a later date Service's claims of contractual and tort liability against Arnold for failure to provide appropriate insurance coverage. This approach was sensible and must have appealed to Judge Blair's strong appreciation of practicality in the administration of justice; obviously if Service were to prevail against Aron on the issue of primary liability for the coffee loss, then there would be no need to proceed against Arnold for indemnity. Shortly after this bifurcation, Service filed its third-party claims against F.F. relating to the issues of coverage of alleged post-fire losses and the Motor Carrier Cargo Liability Certificate of Insurance, which the Interstate Commerce Commission required to be filed on behalf of Service pursuant to the authority of 49 U.S.C. § 10927 and 49 C.F.R. § 1043.1(b).[2]

Trial was held before Judge Blair in December of 1979. On February 4, 1980, 486 F.Supp. 1070 (D.Md.1980), Judge Blair ruled that Service was liable to Aron for the damage to the coffee beans; that Aron's recovery ought to be reduced by the amount of Service's counterclaim for storage charges; that post-fire loss to the coffee beans, if any, was without the coverage of the F.F. policy; and that pursuant to the I.C.C. certificate and endorsement Aron could recover $10,000 of its claim against Service from F.F. Procedurally speaking, the result was judgment for plaintiff on

primary liability partially set off by a counterclaim, *dismissal* of Service's third-party claim against F.F.,[3] and judgment for plaintiff Aron on its claim under Rule 14(a) against F.F. based on the I.C.C. endorsement attached to Service's insurance policy. Judgment was entered on February 5, 1980.

Shortly thereafter counsel for Aron, having learned that Service was closing down its operations at various locations, moved the court to certify Aron's judgment against Service under Rule 54(b) in order to protect the integrity of that judgment. The court, finding no just reason for delay in the entry of such judgment as a final judgment, so ordered on March 27, 1980.

As the trial of the remainder of this bifurcated case approaches, the court is now called upon to decide the motion by Service to amend yet again its third-party complaint in order to allege against F.F. substantially the same theory it currently alleges against Arnold. F.F. opposes the motion to amend, arguing that it has already been a third-party defendant in this case once before and that principles of *res judicata* should preclude Service from litigating F.F.'s liability anew. Service retorts that *res judicata* is inapplicable here for two reasons: first, because the doctrine applies only to final judgments and the only part of the prior judgment certified as final was Aron's judgment against Service; and second, because *res judicata* would only bar

---

**2.** These third-party claims against F.F. were in apparent conformity with allegations in the complaint brought by Aron. In addition to its claim for damages occasioned by the fire loss, Aron sought redress for additional loss or damage to the coffee occurring *after* the fire at the Kresson Street terminal, *i. e.* damage that would probably be within the express coverage of the F.F. insurance policy.

Additionally, Aron asserted claims directly against the third-party defendant F.F. based upon the I.C.C. certificate, contending that the requirement of the I.C.C. certificate *ipso facto* evidenced a duty running from the insurer to the shipping public and that Aron, as a member of that public, was a third-party beneficiary of the insurance contract between Service and F.F. 49 U.S.C. § 10927 requires the kind of endorsement provided, which was entitled "Endorsement for Motor Common Carrier Policies of Insurance for Cargo Liability." The en-

dorsement carried a limitation on liability of $5,000 for losses carried on any one motor vehicle and in any event a maximum of $10,-000.

On December 7, 1979 Judge Blair, finding that the I.C.C. endorsement was unaffected by any contractual provisions limiting F.F.'s liability to *Service*, and that the certificate contemplated a duty running from the insurance carrier to the shipper (contingent of course on the motor carrier's liability to the shipper), denied F.F.'s motion to strike Aron's claims and the alternative motion for judgment on the pleadings. F.F. thus litigated as a third-party defendant in the trial on primary liability of Service to Aron.

**3.** This was the second judgment in F.F.'s favor on the claim of Service that the loss, or a part thereof, was covered by the insurance policy.

relitigation of the same cause of action—whereas the first third-party claim dealt with F.F.'s liability on the contract of insurance, the amended third-party claim proceeds on a theory of liability outside the contract.

At the hearing held in this matter, the court observed that it was, in a very real sense, unfair for counsel to continue to compel F.F. to keep shuttling in and out of the case. Counsel for Service took the position, however, that the liberality with which Rule 15 on amendment of pleadings is to be construed together with the absence (in his view) of *res judicata* as to the new claim results in an ability to keep inserting F.F. into this litigation limited solely by the imagination of counsel in formulating new causes of action. Indeed, counsel for Arnold at this same hearing advanced a new theory of liability for F.F. based on its insurance contract with Service; but if anything in this case is clear, it is that F.F.'s liability on that contract has already been adjudicated, not once but *twice*, and that is the law of the case as far as this court is concerned.[4]

The court is well aware of the ingenuity displayed by all counsel in this matter in what is transparently an effort to keep the "deep pocket" in the case. Even counsel for Aron, the judgment creditor in whose favor judgment was certified under Rule 54(b), participated in this effort when it sought, some months ago, to intervene under Rule 24 and assert a cause of action against F.F. for breach of its insurance contract with Service. In its memorandum dated January 8, 1981, this court denied Aron leave to intervene, stating:

> Aron cannot come in and out of the case at will, asserting whatever claims it wishes to do depending on the posture of the case. It has no right, for example, to resuscitate a claim that Fireman's policy covers Service when the court has already fully litigated that issue and determined that the policy does not cover goods not in transit. As to Fireman's, Aron has brought to the court's attention no new issues of fact or law, and there is no justification for allowing Aron "another bite at the apple."

Memorandum and Order, Jan. 8, 1981 at 6.

# I

In that same memorandum, the court denied F.F.'s motion to certify as final under Rule 54(b) its declaratory judgment of noncoverage in 77–2003 and the judgment in 77–1542 denying any claim of Service against F.F. for damage to coffee in transit following the fire and fixing F.F.'s exposure under the I.C.C. mandated endorsement at $10,000. The principal arguments in opposition to F.F.'s motion had been made by Service and by Aron, as summarized at page 7 of the Memorandum:

> ... Service objects on the ground that the object of Rule 54(b) is to permit a party to appeal part of a multi-party, multi-issue case only where there is no reason for delay. It accuses Fireman's of seeking to finalize a judgment in its (Fireman's) favor to force the other side (Service) to appeal while trying the remaining issues which might render the appeal moot. This, says Service, would create the possibility of several appeals going forward at the same time Service is pursuing a trial in the District Court. J. Aron joins Service in opposing Fireman's Rule 54(b) Certification request. It argues that the Rule 54(b) Certification of the final judgment in its favor against Service was entered because it appeared the defendant-debtor (Service) was going out of business. No similar basis exists for finalizing the judgments obtained by Fireman's, *especially* at a time, it is urged, *when other claims against Fireman's may still be outstanding.* (Emphasis supplied)

---

4. Judges of coordinate jurisdiction should be particularly hesitant to undo, overrule, or refuse to be bound by each other's decisions in the same case. This is not because there is a lack of power to alter or amend a decision, nor is it merely based upon mutual respect; rather it is based on the salutary principle, noted by Learned Hand, that the ends of justice are best served by discouraging litigants from "judge shopping" until they can obtain a favorable ruling. *See Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131 (2d Cir. 1956).

When ruling on the certification question, the court construed that part of the argument contained in the above-emphasized language as referring to the first Fourth-Party complaint filed by Arnold against F.F., which was in the same memorandum and order dismissed with leave to amend. The emphasized language admits of another interpretation as well, namely as a manifestation of the continued efforts by the other three parties to keep F.F. in the case. In this wise, the court finds it appropriate at this time to reconsider its earlier denial of certification.

Prior to the adoption of the Federal Rules of Civil Procedure,[5] the prevailing theory on finality of judgment was the "single judicial unit theory", which, subject to limited exceptions,[6] regarded as a judicial unit all claims and counterclaims in an action involving multiple claims or multiple parties. Under this view a judgment lacked finality which terminated the action as to one or more, but less than all, claims or parties. *See Collins v. Miller*, 252 U.S. 364, 40 S.Ct. 347, 64 L.Ed. 616 (1920); *Hohorst v. Hamburg-American Packet Co.*, 148 U.S. 262, 13 S.Ct. 590, 37 L.Ed. 443 (1893). The simplicity of this procedural device accorded with the simplicity of the actions prevalent at that time. Even prior to 1938, however, it was recognized that completely severable claims in multiple party cases were reviewable, *see, e. g., United States v. River Rouge Co.*, 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1920); *Hill v. Chicago & Evans-*ton R.R. Co., 140 U.S. 52, 11 S.Ct. 690, 35 L.Ed. 331 (1891); *Republic of China v. American Express Co.*, 190 F.2d 334, 335–36 (2d Cir. 1951), and the increasing complexity of litigation (as exemplified, perhaps, by cases like the one at bar) called for a method by which the interests of the parties and of the judicial system could be accommodated simultaneously.

The exigencies of modern litigation are accommodated nowadays by Rule 54(b), which allows a district court dealing with multiple claims or multiple parties to direct the entry of final judgment as to fewer than all the claims or parties, upon the express determination that there is no just reason for delay. In *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1956), the Supreme Court outlined the steps a district judge should follow in making a determination under Rule 54(b). First it must be determined that the judgment under consideration is a "final judgment": a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action."[7] *Id.* at 436, 76 S.Ct. at 900. Second, the court must determine whether there is any just reason for delay. In this endeavor, the function of the district court was characterized as that of a "dispatcher", *id.* at 435, 76 S.Ct. at 899, exercising sound judicial discretion in deciding when each "final judgment" is ready for appeal.

---

5. The common law rule announced in *Metcalfe's Case*, 11 Coke 38, 77 Eng.Rep. 1193 (1615) was that removal of the record of the case to the King's Bench before the whole case was determined would be a "failure of right" and that a writ of error would not lie until judgment was had on the entirety. The somewhat rigid conceptualism characteristic of the development of the common law in medieval England left its legacy on the appellate court's reasoning that "the original [record] is entire and cannot be there [the Court of Common Pleas] and here likewise." 77 Eng.Rep. at 1196. That same legacy and the reasoning in *Metcalfe's Case* was adopted in the nineteenth century by our Supreme Court in *United States v. Girault*, 52 U.S. 22, 11 How. 22, 31–32, 13 L.Ed. 587 (1850).

6. The exception noted in *Metcalfe's Case* itself, *supra* n.5, was that a writ of error would lie in a multiple party action in debt where the liability of the defendants was several and there was error in the judgment against one.

7. The version of Rule 54(b) construed by the Court in 1956 applied only to an action involving more than one claim for relief and was not applicable by its terms to the multiple party situation. The rule was amended in 1961 to comprehend judgments where multiple parties are involved, and it should be noted that the Supreme Court's reasoning in *Sears* 25 years ago, as rejuvenated in *Curtiss-Wright Corp. v. Gen'l Electric Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), is equally applicable to multiple-claim and multiple-party situations.

In *Curtiss-Wright Corp. v. Gen'l Electric Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980) the Court approved its prior decision in *Sears* and recognized that a district court's exercise of discretion in the "interest of sound judicial administration", 351 U.S. at 437, 76 S.Ct. at 900, "presents issues not always easily resolved...." 446 U.S. at 10, 100 S.Ct. at 1466. Noting only that "sound judicial administration does not require that Rule 54(b) requests be granted routinely", *id.*, the Court declined "to fix or sanction narrow guidelines for the district courts to follow." *Id.* at 11, 100 S.Ct. at 1466. Notwithstanding this comment, the Court did find that it was proper for the district court "to consider such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.* 446 U.S. at 8, 100 S.Ct. at 1465.

■ It remains, therefore, to apply the teachings of *Sears* and *Curtiss-Wright* to the instant case. First it is apparent that both Service's claim against F.F. for liability on its contract of insurance and Aron's claim against F.F. for liability on the I.C.C. endorsement were "cognizable claims for relief" and that Judge Blair's decisions on these points constituted an "ultimate disposition" as to each. Thus we are dealing with a "final judgment". The crucial inquiry is, then, whether this court, in its role of "dispatcher", should find, in the exercise of sound judicial discretion, that there is no just reason for delaying certification.

The arguments of Service and Aron in a previous episode of this litigation with regard to the certification of judgments in F.F.'s favor have already been recounted, *ante* at 431–432. Service's position was that it would be forced to take piecemeal appeals to the United States Court of Appeals for the Fourth Circuit while simultaneously trying issues which might render the appeal moot. It is necessary to dig beneath the attractive surface of this argu-

ment and examine the posture of the claims on appeal vis-a-vis the claims yet to be tried. Already certified for appeal by virtue of Service's uncertain status as a viable business enterprise is (1) Aron's judgment for damage to its coffee beans. Added to that issue, if this court should certify the question (*and* if Service should choose to take an appeal) would be (2) the judgment that the F.F. insurance policy does not cover the loss to the coffee beans because they were not "in transit", and (if F.F. chooses to appeal) (3) Aron's $10,000 judgment against F.F. on the I.C.C. endorsement. The claim remaining to be tried in this court is Service's third-party claim that Arnold breached its duty as Service's agent to procure insurance coverage adequate to protect the full extent of Service's operations. Using the indicium of sound judicial administration identified in *Curtiss-Wright*, the court finds that even were all three enumerated issues to be adjudged on appeal, the appellate court would not, if a subsequent appeal were taken from the outcome of Service's claim against Arnold, have to decide the same issues more than once. Moreover, Service's assertion that the outcome of the case against Arnold might moot the issues on appeal does not withstand analysis, for Arnold's liability to Service, if any, would be based on a breach of its duty as an agent of its principal, Service, and would be independent of and have no effect on Service's primary liability to Aron, F.F.'s liability to Aron, or the construction of F.F.'s insurance contract with Service. If Arnold prevails against Service, it will not be because the insurance policy procured covered the loss—a conclusion of law already determined otherwise— but because either (A) Service fails to prove some element of its *prima facie* case, *e. g.* that Arnold owed a duty to Service, or (B) Arnold is able to prove that the insurance procured was adequate because of a failure by Service to provide sufficient information about the extent of its own operations. There is, of course, the possibility that the disposition of an issue *on appeal* might moot the outcome of *Service v. Arnold, e. g.* if the Court of Appeals decides that the F.F.

policy does indeed cover the coffee loss; but this possibility is nothing different from the potential existing in every case that time and judicial resources expended in the district court will be vitiated by a finding of error on appeal.

The court also notes that as the Fourth Circuit Court of Appeals has not yet heard argument in that portion of the case heretofore certified as final, and as the trial date set for Service and Arnold looms less than one week hence, there is minimal danger of piecemeal appellate review if this court were now to certify the judgments involving F.F.

Reconsideration of Aron's argument leads to its rejection as well. It is true, of course, that the uncertainty of Service's continued viability as a business entity recommended certification as between Aron and Service in order to protect Aron's judgment, but it can hardly be said that the absence of a similar circumstance as between Service and F.F. is a "just reason for delay". The Supreme Court in *Curtiss-Wright, supra,* regarded the lack of insolvency or danger of insolvency as a neutral factor in a situation where it was clear that one party or the other would be entitled to the sum of money in question. 446 U.S. at 12, 100 S.Ct. at 1467. The present situation is, if anything, even more neutral.

For the foregoing reasons, therefore, the court finds that there is no just reason for delaying entry of a final judgment with regard to the matters already litigated by F. F.; accordingly entry of judgment will be directed.

## II

Now it is appropriate to deal with the question of *res judicata.* This doctrine gives effect to an important public policy that there be an end to litigation. *See Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). The primacy of this policy can perhaps best be appreciated by recalling those cases which have regarded it more desirable to bring litigation to a close than to allow further argument on issues already heard

and decided on the chance that the previous determinations will be shown to have been erroneous. *Stoll v. Gottlieb,* 305 U.S. 165, 172, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938); *Baldwin v. Iowa State Traveling Men's Association,* 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931). *See also Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *United States v. Silliman,* 167 F.2d 607 (3d Cir.), *cert. denied,* 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948). Under the traditional view of bar and merger a final determination on the merits precludes relitigation between the same parties (or those in privity with them) of any matter which was or might have been presented in the first suit. *E. g., Mendez v. Bowie,* 118 F.2d 435, 440 (1st Cir.), *cert. denied,* 314 U.S. 639, 62 S.Ct. 76, 86 L.Ed. 513 (1941). If there were no such principle of preclusion it would be necessary to invent one, as some litigants might bring additional suits on the same cause of action countless times in the hope either of ultimately procuring a favorable judgment or obtaining a larger recovery on a claim already won. As noted by Professor Allan Vestal, "Examples of this desire to relitigate are easy to find and many litigants today attempt to relitigate claims and issues even though we do have the doctrine of preclusion." Vestal, *Res Judicata/Preclusion by Judgment: The Law Applied in Federal Courts,* 66 Mich.L.Rev. 1723 n.3 (1968), citing *Fiumara v. Sinclair Refining Co.,* 385 F.2d 395 (3d Cir. 1967); *Rhodes v. Jones,* 351 F.2d 884 (8th Cir. 1965), *cert. denied,* 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673 (1966); *Heasley v. United States,* 348 F.2d 40 (8th Cir. 1965).

Where a second suit between the same parties involves a different cause of action, however, the absolute barriers of merger and bar do not apply, and only issues of fact actually litigated in the first suit may be precluded from relitigation under the doctrine of collateral estoppel. *See, e. g., Cromwell v. County of Sac,* 94 U.S. 351, 352–53, 24 L.Ed. 195 (1876). It follows, therefore, that the determination of what constitutes a "cause of action" is crucial if a

conclusion as to the *res judicata* effect of the first suit is to be reached. It is for this reason that the principle of *res judicata* has often been referred to as the rule against splitting a single cause of action.

Initially, however, it is necessary to decide what body of law to look to in a diversity case for the definition of "cause of action". In the instant case, that question boils down to whether to apply federal law or Maryland law in resolving this question. As noted by Professor Vestal:

> A federal court faced with an assertion of preclusion arising from an earlier decision must consider a number of different possible sources of law and relevant variables before a final conclusion is reached. First, the concept of full faith and credit as found in the federal Constitution and the implementing federal statute must be considered. Second, in cases involving nonfederal subject-matter jurisdiction, the *Erie* doctrine and its ramifications need to be examined to see whether resort must be had to the law of the state in which the federal court is sitting. Third, the interest of the federal court system in the adjudication must be considered, since under the principle of *Hanna v. Plumer*, and possibly other rationales, the federal interest is a factor which may affect the law to be applied.

An examination of the federal court decisions on preclusion reveals that there is a lack of consistency or rationality in the law being applied. Courts often present different principles as applicable; some present no justification, in terms of the source of the law being applied, for the conclusion reached; and, some courts recognize the problem but refuse to face up to it. The latter approach is typified by the courts which indicate that they are uncertain about the source of the law applicable—whether one state or another or the federal law—but conclude that it makes no difference since the various laws are all the same.

In part, this lack of consistency or rationality is due to a failure on the part of attorneys to recognize the complex choice-of-law problems involved. . . .

*Vestal, supra*, 66 Mich.L.Rev. at 1726–27 (citations omitted). In an attempt to provide a sound basis for principled decision-making in this thorny area, the court will face the choice-of-law question head on.[8]

### A. Choice of Law

The Full Faith and Credit clause of the Constitution is found in Article IV, § 1, and provides in full:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general

---

**8.** Vestal appears correct in observing the failure of the bar to grapple effectively with so rich and complex an area of law. The attorneys in the instant case had not addressed the choice-of-law question in their papers, and seemed surprised when the court raised it at oral argument.

The response of most lawyers, not to mention judges, when faced with a choice-of-law question in a diversity case is to utter, often with a mixture of reverence and nostalgia, the word "*Erie*", as if that utterance, like some mystical incantation, weaves a spell that settles the matter conclusively. *E. g., Priest v. American Smelting & Refining Co.*, 409 F.2d 1229, 1231 (9th Cir. 1969); *Mackris v. Murray*, 397 F.2d 74, 75 (6th Cir. 1968); *Graves v. Associated Transport, Inc.*, 344 F.2d 894, 896 (4th Cir. 1965); *Centennial Ins. Co. v. Miller*, 264 F.Supp. 431, 433 (E.D.Cal.1967). Other cases have made the conclusory application of state law *without* citing *Erie*—see *Breeland v. Secur-*

*ity Ins. Co.*, 421 F.2d 918 (5th Cir. 1969); *Kimmel v. Yankee Lines*, 224 F.2d 644 (3d Cir. 1955); *Standard Accident Ins. Co. v. Doiron*, 170 F.2d 206 (1st Cir. 1948); *Chase v. Pope*, 247 F.Supp. 110 (E.D.Tenn.1965); *Eisel v. Columbia Packing Co.*, 181 F.Supp. 298 (D.Mass. 1960); *Wright v. Walling*, 159 F.Supp. 190 (W.D.Ark.1958); *Heaton v. Southern Ry. Co.*, 119 F.Supp. 658 (W.D.S.C.1954)—or have only cited to decisions which themselves had relied on *Erie*, see *Hackler v. Indianapolis & Southeastern Trailways Inc.*, 437 F.2d 360 (6th Cir. 1971); *Steyer v. Westvaco Corp.*, 450 F.Supp. 384 (D.Md.1978); *Travelers Corp. v. Boyer*, 301 F.Supp. 1396 (D.Md.1969).

If there has been a spell cast by these *Erie* incantations, however, it has produced more befuddlement than enchantment. Though applying state law may be correct in certain cases, that result should be the product of analysis and not the adventitious byproduct of invoking the *Erie* talisman.

Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

Acting under the express power granted by this clause as well as the power granted under Article III, Congress has enacted a law that not only establishes a requirement that legislation, records and judicial decisions be authenticated before being extended full faith and credit, but also imposes upon federal courts the same full faith and credit obligations that the Constitution imposes upon the state courts. 28 U.S.C. § 1738.[9] Thus this statute, dating back to 1790, enjoins the federal courts to accord state court judgments the same "faith and credit" they enjoy by "law or usage" in the court of rendition. Conspicuous by its absence was any kind of reciprocal provision requiring state courts to give full faith and credit to federal court judgments, but if this omission ever presented any problem,[10] it was cured by the Supreme Court's decision in *Stoll v. Gottlieb, supra*, 305 U.S. at 170, 59 S.Ct. at 136, holding that a complementary obligation devolved upon the state courts. *See also Embry v. Palmer*, 107 U.S. 3, 2 S.Ct. 25, 27 L.Ed. 346 (1882). It is clear that the result in these cases is correct, as the purpose of full faith and credit, like the doctrine of *res judicata*, is to "establish throughout the federal system the salutary principle of the common law that a litigation once pursued to judgment shall be conclusive of the rights of the parties in every other court as in that where the judgment was rendered." *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439, 64 S.Ct. 208, 214, 88 L.Ed. 149 (1943) (Stone, C. J.).

*Coppedge v. Clinton*, 72 F.2d 531 (10th Cir. 1934), decided in those halcyon pre-*Erie* days, applied the statutory forerunner of what is now codified in 28 U.S.C. § 1738 in declining to give *res judicata* effect to the judgment of a state court where the courts of that same state would not have accorded such effect. The question this court must now address is whether the *Erie* decision compels a federal court sitting in diversity to apply the law of the forum state in determining what effect to give to judgments not only of the forum state's courts but also of other states' courts.

In the first place, this question was expressly left open by the Supreme Court in *Heiser v. Woodruff*, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946):

> We need not consider whether, apart from the requirement of the full faith and credit clause of the Constitution, the rule of *res judicata* applied in the federal courts, in diversity of citizenship cases, under the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 ... can be other than that of the state in which the federal court sits. For nothing decided in *Erie* ... requires a court of bankruptcy, in applying the statutes of the United States governing the liquidation of bankrupts' estates, to adopt local rules of law in determining

---

9. 28 U.S.C. § 1738. *State and Territorial statutes and judicial proceedings; full faith and credit.*

   The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

   The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

   Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

10. No case has been found in which a state court declined to give full faith and credit or *res judicata* effect to a judgment of a federal court. This reciprocity can be found in a case reported as early as 1824, a detinue action for a slave sold under judgment of the federal court in North Carolina, wherein the North Carolina state judge found that the earlier judgment was "pronounced by a Court as stable, and as strongly constituted by the Constitution and laws of the country, as the Court we sit in, and it is a Court too of competent jurisdiction." *Pigot v. Davis*, 10 N.C. (3 Hawks) 25, 27 (1824).

what claims are provable, or to be allowed, or how the bankrupt's estate is to be distributed....

*Id.* 327 U.S. at 731–32, 66 S.Ct. at 855–856. The Court has never again had occasion to face the question.[11]

The *Erie* case, it will be remembered, arose as a negligence action brought by Tompkins, a Pennsylvania citizen, who was injured by something protruding from a passing freight train belonging to the Erie Railroad, a New York corporation, when that train passed Tompkins one dark night as Tompkins was walking along the right of way. The railroad claimed that it owed no greater duty to Tompkins than it owed to a trespasser, as Tompkins would be deemed under Pennsylvania law, and that its liability should be determined in accordance with Pennsylvania law, insisting that application of the Pennsylvania trespass rule was required by section 34 of the Judiciary Act of 1789. That provision, popularly called the Rules of Decision Act, is now codified in 28 U.S.C. § 1652 and provides:[12]

> The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

The Supreme Court in *Erie* was called upon to reconsider its decision in *Swift v. Tyson*, 16 Pet. 1, 10 L.Ed. 865 (1842), which had permitted a federal court sitting in diversity to disregard the substantive law of the forum state in matters of general jurisprudence.[13] Mr. Justice Brandeis' land-

---

11. The Court's opinion in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 325, 91 S.Ct. 1434, 1441, 28 L.Ed.2d 788 (1971) does contain the following statement:

> Many federal courts, exercising both federal question and diversity jurisdiction, are in accord [on dispensing with the mutuality requirement for collateral estoppel] unless in a diversity case bound to apply a conflicting rule requiring mutuality.

Commenting on this passage, Professor Ronan Degnan has written:

> Following this statement in *Blonder-Tongue's* text is a string of citations to cases ... which seem to bear out the principle that federal courts in diversity cases may be required to conform to state law on the scope or effect of a judgment. Nevertheless, this statement in the opinion is certainly not a holding (*Blonder-Tongue* itself arose entirely under federal question jurisdiction—a patent infringement—rather than diversity jurisdiction) and should not even be regarded as dictum. It is merely a factual observation—most federal courts have said that in diversity cases they are bound to apply the law of judgments of the state in which they sit.

Degnan, *Federalized Res Judicata*, 85 Yale L.J. 741, 751 (1976). This court agrees with Professor Degnan's view of the *Blonder-Tongue* language.

12. The language of the Rules of Decision Act as it appeared in 1938 is set forth in the *Erie* opinion, 304 U.S. at 71, 58 S.Ct. at 819. This statute was cosmetically revised in 1948, substituting the phrase "civil actions" for the earlier "trials at common law", to appear as quoted in the text. *See* C. Wright, Law of Federal Courts 249 n.3 (3d ed. 1976).

13. *Swift v. Tyson* was concerned with whether a pre-existing debt was good consideration for an endorsement of a bill of exchange so that the endorsee would be a holder in due course. *See generally* C. Wright, *supra* n.12, at 249–51. Earlier Supreme Court decisions had deemed a pre-existing debt good consideration, but in the absence of a clear New York ruling on this subject, Mr. Justice Story assumed *arguendo* that the consideration would be inadequate under New York law and held nevertheless that such a New York rule could be ignored by a federal court sitting in diversity.

Justice Story's decision in *Swift* was predicated on two separate grounds. The first was his construction of the phrase "laws of the several states" in the Rules of Decision Act to include only statutory law and not court decisions. This ground was repudiated by Justice Brandeis in *Erie*, relying on the research of Professor Charles Warren. 304 U.S. at 73, 58 S.Ct. at 819. *See* Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv.L.Rev. 49 (1923); *cf.* Shulman, *The Demise of Swift v. Tyson*, 47 Yale L.J. 1336 (1938). The second ground was the goal of uniformity of decision on questions of general commercial law as opposed to matters of purely local concern. This goal was *not repudiated* in *Erie*; instead Justice Brandeis merely observed that the hoped-for uniformity had not been realized. The diversity jurisdiction had been intended to eliminate the potential for bias in local courts in favor of residents in suits brought by out-of-state parties, but the application of the *Swift* rule had led to forum-shopping and discrimination by noncitizens against citizens. Thus the *Erie* case has come to be interpreted as fulfilling two aims: discourage-

mark opinion held that the construction in *Swift v. Tyson* of the Rules of Decision Act was erroneous and concluded, "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied·in any case is the law of the State." 304 U.S. at 78, 58 S.Ct. at 822.

Early applications of the *Erie* doctrine, such as the "outcome determinative" test of *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) and the unfortunately broad statement—first appearing in *Guaranty Trust*, 326 U.S. at 108, 65 S.Ct. at 1469 and later quoted with approval in *Angel v. Bullington*, 330 U.S. 183, 187, 67 S.Ct. 657, 659, 91 L.Ed. 832 (1947)— that a federal court exercising diversity jurisdiction is, "in effect, only another court of the State",[14] have been cut back by subsequent Supreme Court decisions. *See, e. g., Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980); *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). This departure from what Vestal calls "the absolutism of *Erie* and *Guaranty Trust Co. v. York*" is applicable in the *res judicata* context not only by the countervailing federal considerations identified in *Hanna* and *Blue Ridge*, but also by the language of the Rules of Decision Act itself.

■ The Rules of Decision Act provides an express exception to its command; *i. e.* federal courts should apply state law "except where the Constitution or treaties ... or Acts of Congress otherwise require or provide." The full faith and credit statute, 28 U.S.C. § 1738, is just such an Act of Congress which otherwise provides. Thus, the federal court for the District of Maryland must give to a prior Maryland state court judgment whatever *res judicata* effect Maryland law or usage provides, but must give a prior Delaware judgment whatever *res judicata* effect would obtain in Delaware, and *not whatever effect Mary-*

ment of forum-shopping and avoidance of inequitable administration of the laws. *Hanna v. Plumer*, 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965).

14. Some court decisions falling within the category mentioned in note 8, *supra*, have actually relied (in whole or in part) on this quotation in *Angel v. Bullington*, wholly divorced from the context in which it appeared, to justify a knee-jerk application of state law. *E. g. Dodge v. Carri-Craft, Inc., Div. of Wisconsin Tanktainer, Inc.*, 332 F.Supp. 651 (E.D.Wis.1971); *Travelers Corp. v. Boyer, supra*, 301 F.Supp. at 1402 n.5.

*Angel v. Bullington* did not, however, deal with the question whether state or federal law governs the applicability of the doctrine of *res judicata*. Bullington, a Virginia citizen, sold land to Angel, a North Carolina citizen, for a cash down-payment and, for the balance, a series of notes secured by a deed of trust on the land. When Angel defaulted on one of the notes, Bullington compelled sale of the land, applied the proceeds to payment of the notes, and brought suit in North Carolina state court for the deficiency. Angel demurred to that action, relying on a North Carolina statute which precluded recovery of such a deficiency judgment. Though Bullington prevailed in the trial court, the state high court reversed, holding that the statute barred Bullington's suit. Rather than seek review of the latter decision in the Supreme Court, Bullington brought the same deficiency action in a diversity suit in a North Carolina federal court, in which he pre-

vailed again despite Angel's pleading the earlier suit in bar. The Supreme Court, reviewing the latter federal judgment (as affirmed by the court of appeals), held that, as the only issue in controversy in F1 (the state court) was whether or not the F1 courts were closed to the deficiency action and as that was the identical issue raised in F2 (the federal court), the matter could not be relitigated. All the federal issues concerning the constitutionality of the North Carolina statute had actually been raised and adjudicated in the state high court, so Bullington's failure to take the matter by appeal or certiorari to the Supreme Court "concluded his litigation as effectively as though he had proceeded through the highest tribunal available to him." 330 U.S. at 189, 67 S.Ct. at 661.

From the foregoing synopsis, it can be seen that *Erie* considerations were immaterial to the decision in *Angel v. Bullington*, and that Justice Frankfurter's quote from his own earlier opinion in *Guaranty Trust*, the very quote so heavily relied on by several subsequent decisions in the lower federal courts, was out of place. *See id.* at 198–99, 67 S.Ct. at 665–66 (Reed, J. with Jackson and Rutledge, JJ. dissenting); *id.* at 201–202 & n.2, 67 S.Ct. at 666–667 & n.2 (Rutledge, J. with Jackson, J. dissenting). It is also apparent, though Justice Frankfurter did not take this approach, that the result reached was correct under the application of the full faith and credit statute, 28 U.S.C. § 1738.

*land law says it deserves.*[15] Put in the familiar conflict of laws terminology, F2 must give an F1 judgment whatever *res judicata* effect it would enjoy in F1; neither the *res judicata* nor the conflicts laws of F2 applies, and *Erie* is irrelevant. Following this kind of reasoning, Professor Degnan has proposed a choice-of-law rule admirable in its Restatement-like succinctness:

> A valid judgment rendered in any judicial system within the United States must be recognized by all other judicial systems within the United States, and the claims and issues precluded by that judgment, and the parties bound thereby, are determined by the law of the system which rendered the judgment.

Degnan, *supra*, n.11, at 773.

■ The instant case presents us with an example where F1 and F2 are identical. Both are the federal district court for the District of Maryland, with different judges presiding. Accordingly, it is to federal law that this court, as F2, must look to determine what claims are precluded by the F1 judgment. This result is squarely within the full faith and credit principle: the federal judgment should be given the "same full faith and credit in *every* court . . . as [it would enjoy] by law or usage" in the court of rendition.

This approach is also consistent with the Supreme Court's decision in *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), wherein it was observed:

> *Erie* and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

*Id.* at 468 n.9, 85 S.Ct. at 1142 n.9. This inquiry [16] regarding the twin aims of the *Erie* doctrine demonstrates the correctness of the result herein reached. First, as to the equitable administration of the laws theme of the *Erie* duet, it is clear that the merits of the case which went to judgment before Judge Blair were governed by the law of Maryland; to argue from this that the federal court, as part of a constitutionally established judicial system equal in dignity to the state judicial system, cannot do its own housekeeping and determine the scope of its own judgments because the end result might be different in a state court is to stretch the *Erie/Guaranty Trust* "outcome determination" test well beyond the limits the Supreme Court has set for it. Second, with respect to the forum-shopping theme, it strains credulity (not to mention fundamental notions of good faith and fair play) to assume that a party would choose a state court over a federal court (or vice versa) on the basis that, if he were to lose, he could keep dragging the defendant back into litigation on different theories until he prevails or he exhausts the capacity of his legal imagination, whichever comes first.

This kind of analysis of the dual *Erie* considerations cannot help but be influenced by the impact of *Byrd v. Blue Ridge Rural Elec. Cooperative Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), which has been described by one commentator as follows:

> In its broadest sweep, the decision in *Byrd* suggests that in any diversity case a federal rather than a state rule will be followed when the following conditions concur: (1) when the state rule is not an

---

**15.** Obviously the same result would obtain if F2 were a Maryland state court instead of the U. S. District Court sitting in diversity, because the F1 judgment must still be given the same effect as it would enjoy by law or usage *in F1.*

**16.** This discussion assumes that the Maryland law of judgments would yield a different result from the federal law, a matter this court finds unnecessary to decide.

integral part of a state-created relation, but appears rather to relate merely to a form or mode of enforcement; (2) when there exists an applicable countervailing federal policy of sufficient strength supporting the federal rule (perhaps influenced by a provision of the Constitution); and (3) when following the state rule would disrupt federal policy.

Smith, *Blue Ridge and Beyond: A Byrd's-Eye View of Federalism in Diversity Litigation*, 36 Tul.L.Rev. 443, 449 (1962). The *Blue Ridge* Court recognized that the federal courts are independent of the state judicial systems and were developed to administer justice to litigants properly invoking their jurisdiction. We deal here with a matter between two courts of the same sovereign, the United States; to consign the governance of that relationship to individual state laws really *would* pose a danger of forum-shopping, this time between different federal districts (provided one could meet the liberal venue requirements—a feat that is none too difficult in corporate litigation).

The administration of the federal judicial system is an overriding federal interest that has been recognized time and again in important decisions. *Hanna v. Plumer, supra; Byrd v. Blue Ridge, supra; Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). In *Kern v. Hettinger*, 303 F.2d 333 (2d Cir. 1962), F1, the federal court for the Northern District of California, sitting in diversity, had entered a judgment of dismissal for lack of prosecution. The plaintiff then attempted to bring the same claim in the Southern District of New York, F2, and the court of appeals ultimately held that suit was precluded by the federal judgment from California. The plaintiff argued on appeal that California law governed the effect of the F1 judgment and that under California law a dismissal for lack of prosecution would be without prejudice. Responding to this contention, Judge Medina wrote:

> One of the strongest policies a court can have is that of determining the scope of its own judgments. Cf. *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*

. . . . It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity. The rights and obligations of the parties are fixed by state law. These may be created, modified and enforced by the state acting through its own judicial establishment. But we think it would be strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights. The Erie doctrine . . . is not applicable here. . . .

303 F.2d at 340.

A more recent decision supporting the result reached herein is *Aerojet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir. 1975). The F1 judgment, affirmed on appeal, was had in the federal court, sitting in diversity, granting specific performance to the plaintiff corporation on its option contract to purchase lands held by a state agency. In the defense of the F1 suit, the state agency did not assert a state statute which required the agency, when contemplating the sale of state-owned land to private parties, first to afford an opportunity to the county in which the land was located to make the purchase. Because of the state agency's failure to transfer title, the District Court for the Northern District of Florida appointed the Clerk of the District Court for the Southern District of Florida (in which jurisdiction lay the land) as a Commissioner for the purpose of executing a deed in favor of the corporation, which tendered a cashier's check for the amount of purchase. Shortly before the appointment of the Clerk as Commissioner, Dade County brought a mandamus action in the Supreme Court of Florida against the state agency to compel it to convey the land to the county pursuant to the state statute, and the state high court ultimately issued the writ, but not before the corporation filed another federal court suit to enjoin further prosecution of the mandamus action by Dade County.

(Admittedly, this F2 suit did not rely merely on diversity of citizenship, as the complaint alleged a federal question). The gravamen of the corporation's complaint was that any assertion of rights under the state statute was barred by the F1 judgment, and the defendants' response was that because F1 jurisdiction was founded on diversity, state law applied to the *res judicata* question, and that the state high court's decision in the mandamus action was the definitive statement of state law on that subject. The Fifth Circuit held federal standards applicable rather than state standards. Noting that federal law would clearly apply where F1 jurisdiction was based on a federal question, the court stated, "We believe the same result obtains where, as in this case, the first suit was brought only under diversity jurisdiction." *Id.* at 715. The court at first emphasized a peculiarity of the *Aerojet* case: by not raising the state statute as a defense in F1, the agency avoided bringing a federal question directly into the case, thus making it appear in F2 that the prior judgment only involved state law issues. The result, said the court, if state law of preclusion were to apply, would be to allow a party to "split his cause of action and thus circumvent the federal law of *res judicata* simply by not pleading his federal claim or defense." *Id.* The court then went on to consider the case *solely* in its diversity aspect and still concluded that federal law of preclusion should be applied:

> The importance of preserving the integrity of federal court judgments cannot be over-emphasized—out of respect for the federal courts and for the policy of bringing litigation conclusively to an end. If state courts could eradicate the force and effect of federal court judgments through supervening interpretations of the state law of res judicata, federal courts would not be a reliable forum for final adjudication of a diversity litigant's claims. . . .

> \* \* \* \* \* \*

A second reason for applying federal law under these circumstances is that several procedural elements of federal practice affect the doctrine of res judicata. For example, federal law on finality of judgments . . . and compulsory counterclaims . . . is often determinative of pleas of res judicata. . . . We see no persuasive reason to look to state law for some elements of res judicata, such as the scope of the cause of action or similarity of the parties, in light of the prominent influence of federal law on other elements of the doctrine. To do so would sacrifice the uniformity of the law which federal courts must apply. . . .

*Id.* at 716–17 (citations omitted; discussion of *Kern v. Hettinger, supra,* omitted).

Judge Ainsworth's opinion in *Aerojet* also took cognizance of two additional points. First was the Supreme Court's recognition in *Byrd v. Blue Ridge,* already discussed *supra,* of countervailing federal considerations which mitigate against the application of state law in some diversity cases. Second was the opinion of Judge Haynsworth in *Atkins v. Schmutz Mfg. Co.,* 435 F.2d 527 (4th Cir. 1970), a case involving the question whether state or federal law controlled whether the filing of one diversity action tolled the applicable statute of limitations as to another diversity action filed in a different district court. Holding that federal law applies, Judge Haynsworth explained:

> It is, of course, neither possible nor necessary for federal courts to be totally neutral in the adjudication of state-created rights. It is not possible simply because federal courts are not protean and are unable to transform themselves into exact replicas of their state counterparts. That state and federal judicial systems are not identic will inevitably mean that the choice of forum will have some effect upon the course of litigation. Some adoption of state court procedures by federal courts sitting in diversity may be feasible, *but it may also be in conflict with fundamental interests of the federal courts in the conduct of their own business and the maintenance of the integrity of their own procedures, the legitimate interests of a federal forum, qua forum.*

442

435 F.2d at 536 (emphasis supplied). Some of these fundamental federal interests were identified in the passages of Judge Ainsworth's opinion in *Aerojet* quoted above. Another interest, not noted therein but nonetheless of primary significance, is judicial economy. As noted by Professor Vestal:

> For the purposes of [the balancing process discussed in *Hanna v. Plumer, supra,* 380 U.S. at 466–67 [, 85 S.Ct. at 1141–42]], it would seem that another federal interest, possibly overriding, might well be the best use of the time of the federal judges. In view of the enormous docket loads of the federal courts, one might well conclude that the federal courts must consider the wise use of the judges' time to be of paramount importance. If this is true, the law of preclusion, which serves to bar unnecessary litigation, would be of great concern to the federal courts and this particular federal interest may be overriding regardless of whether the court handing down the first judgment was a state or federal court.

Vestal, *supra,* at 1742 (citations omitted). Plainly, allowing amendment of Service's third-party claim in the instant case would greatly magnify the issues to be tried, especially when these claims could and should have been brought before Judge Blair at an earlier stage of this litigation. This is in addition to the manifest prejudice to a party like F.F., which despite its best efforts to the contrary, keeps being dragged back into the fray.

For all of the foregoing reasons, the *res judicata* rules of the federal courts should be applied under either the "countervailing federal policy" analysis or the prior analysis based solely upon the full faith and credit statute. A judgment rendered in federal court by a federal judge should be viewed in the manner federal courts see it. It remains for this court now to elucidate the federal law of *res judicata* and apply it to the facts of this case in order to determine whether Service has indeed split its cause of action.

### B. Defining "cause of action" under federal law

In the first place, it cannot be denied that there most emphatically *is* a distinctly federal law of *res judicata*. *See, e. g., Parklane Hosiery v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Heiser v. Woodruff,* 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946); *Jackson v. Irving Trust Co.,* 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297 (1941); *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940). Under this federal law of *res judicata* a party must raise all claims that are a part of or a defense to the cause of action under adjudication. *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940); *Baltimore S.S. Co. v. Phillips,* 274 U.S. 316, 321, 47 S.Ct. 600, 602, 71 L.Ed. 1069 (1927).

At common law the determination of the scope of *res judicata* was coextensive with the old forms of action. *Cf.* Millar, *The Historical Relation of Estoppel by Record of Res Judicata,* 35 Ill.L.Rev. 41 (1940); Millar, *The Premises of the Judgment as Res Judicata in Continental and Anglo-American Law,* 39 Mich.L.Rev. 1, 238 (1940). Under that regime, *res judicata* applied only where a plaintiff brought the same form of action on the same facts as in the prior case.[17]

---

17. Whether a second action alleging the same facts could be brought under a different form of action at common law depended on whether the plaintiff had lost the first action. If the plaintiff had won in F1, merely changing forms of action was generally insufficient to permit the second action because of the policy of the law forbidding double recovery for the same injury. If, however, the plaintiff had lost in F1, then further inquiry was necessary.

Because of the formality of the issue-framing procedure at common law, if a plaintiff had lost in F1 because the form of action he had chosen was inappropriate, a later suit was not precluded, but it should be noted that the explanation for this is not that the second action rested on a

While it was true, even at common law, that a plaintiff could not avoid the strictures of *res judicata* by the mere expedient of changing forms of action, *see* H. Black, Judgments 1091 (1902), it was also recognized that a particular event could give rise to two or more different causes of action. *Id.* at 1095.

The procedural reforms of the nineteenth century, beginning with the famous Field Code of 1848, led to the abolition of the old forms of action and the merger of law and equity. In the early days of code pleading, it may have been tacitly assumed, perhaps as a carry-over from prior days, that a general definition of "cause of action" existed, but no single definition ever enjoyed a consensus among legal scholars. Toward the end of the nineteenth century it was generally understood that the term "cause of action" referred to a set of facts,[18] but several interpretations arose as to what that set of facts had to contain to constitute a unit deemed a cause of action.[19] Even on into the pre-Federal Rules period of this century, the precise definition of the term "cause of action" and the limitations thereon generated significant debate among legal scholars. *See* McCaskill, *Actions and Causes of Action*, 34 Yale L.J. 614 (1925); Arnold, *The Code "Cause of Action" Clarified by United States Supreme Court*, 19 A.B.A.J. 215 (1933); Gavit, *A "Pragmatic Definition" of the "Cause of Action"?*, 82 U.Pa.L.Rev. 129 (1933); McCaskill, *The Elu-*

different cause of action but that the first decision had not been "on the merits".

**18.** In prescribing what a complaint had to contain, the Field Code itself referred to "the facts constituting the cause of action".

**19.** Professors James and Hazard mention three definitional theories of the term "cause of action" that were prevalent in the nineteenth century: the "same remedial right" theory, the same "substantive" or "primary" right theory, and the "same evidence" theory. F. James & G. Hazard, Civil Procedure 541–42 (2d ed. 1977).

The first of these theories viewed a cause of action as seeking to vindicate a single remedial right. Professor McCaskill was the chief proponent of this approach in the modern era, expounding the view that a plaintiff could sue for a single injury arising out of a single transaction or occurrence as many times as he could devise legal theories. *See* McCaskill, *Actions and Causes of Action*, 34 Yale L.J. 614 (1925); McCaskill, *The Elusive Cause of Action*, 4 U.Chi.L.Rev. 281 (1937). *See also* C. Clark, Code Pleading 132–34 (2d ed. 1947). For example, a plaintiff suing on the same breach of contract could assert in one suit a claim for damages and in a subsequent suit a claim for specific performance, because he was asserting rights to two different remedies. Similarly, a plaintiff could pursue both a damage remedy and a remedy in *quantum meruit* or unjust enrichment in separate actions. *Cf. Smith v. Kirkpatrick*, 305 N.Y. 66, 111 N.E.2d 209 (1953). Of course, in the examples just given the plaintiff could not prevail in both actions because of the prohibition against double recovery.

The "substantive" or "primary" right theory, which defines "cause of action" in terms of a single delict or breach of a primary duty, is most often associated with the work of John Norton Pomeroy. *See* J. Pomeroy, Code Remedies §§ 346–56, 417 (5th ed. 1929). Using our familiar breach of contract example, a plaintiff proceeding under this theory would have only one cause of action, even though he might have two possible remedies (i. e. damages or specific performance), because his primary right (to performance of the contract) and the defendant's delict (refusal to perform) are two sides of the same coin. In contrast, a case involving negligence in an auto collision would yield two causes of action because the plaintiff's right to bodily integrity (in his claim for personal injuries) is a different "primary right" from his rights in his personal property (in his claim for damage to his car). *See* Schopflocher, *What is a Single Cause of Action for the Purpose of the Doctrine of Res Judicata?*, 21 Or.L.Rev. 319 (1942).

The "same evidence" theory defined "cause of action" in terms of factual content. The simplest version of this theory would require that the same evidence support both actions. *See Vasu v. Kohlers, Inc.*, 145 Ohio St. 321, 334–35, 61 N.E.2d 707, 715 (1945). This approach, however, "left unanswered the question, 'Evidence of what—evidence of liability, of all losses, or of particular losses?'" F. James & G. Hazard, *supra*, at 542. At times, this approach figured as a positive but not a negative test, reflecting the view that the "same evidence" test was a good method of determining when two suits did involve the same cause of action but was not particularly good for determining when they did not. Thus, the lack of identity of evidence did not necessarily mean that the second suit should be allowed. *Cf. Williams v. Jensen*, 81 Nev. 658, 408 P.2d 920 (1965). This was the approach of the first Restatement of Judgments, § 61, Comment a.

*sive Cause of Action,* 4 U.Chi.L.Rev. 281 (1937).

As one commentator has noted:

Given such definitional flexibility, it is clear that the nature and scope of the term may be broadened or narrowed to achieve the equitable purposes underlying the doctrine of res judicata. These purposes are generally thought to include the termination of litigation, the prevention of harassment of the defendant and the efficient use of a court's time and energy.

Note, *Res Judicata: Exclusive Federal Jurisdiction and the Effect of Prior State-Court Determinations,* 53 Va.L.Rev. 1360, 1361–62 (1967), citing, *inter alia, Baldwin v. Traveling Men's Ass'n,* 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931) (to end litigation); *White v. Adler,* 289 N.Y. 34, 42, 43 N.E.2d 798, 801–02 (1942) (to avoid inequitable vexation of defendant); *State ex rel. White Pine Sash Co. v. Superior Ct.,* 145 Wash. 576, 577, 261 P. 110, 111 (1927) (for benefit of defendant); *Burton v. State Farm Mut. Auto Ins. Co.,* 335 F.2d 317, 325 n.15 (5th Cir. 1964) (husbanding of judicial manpower).

In addition to these interests, the definition of "cause of action" ought to reflect the broad definition of "claim" under the notice pleading philosophy prevalent in the federal courts since 1938. Under this view, a "claim" comprises the set of operative facts which were, or under the liberal amendment practice [20] could have been, alleged by the plaintiff.

The federal practice may profitably be contrasted with the approach taken under the state codes. According to Judge Clark's treatise, the state code approach required pleading of the "ultimate material operative facts constituting the plaintiff's cause of action." C. Clark, Code Pleading 225 (2d ed. 1947). These material operative facts reflected the substantive law upon which plaintiff's "cause of action" was based. *Id.* An action in F2, based on different substantive law, would not be barred by *res judicata,* even though the facts might be the same. In contrast, the approach taken by the federal rules of procedure defines "cause of action" or "claim" *without reference to* a particular rule of substantive law; accordingly a subsequent action based on the same set of facts or "transaction" should be barred.

Professor Moore, in criticizing an Ohio Supreme Court decision which applied one of the older approaches (the "same evidence" approach), takes the position that "a second suit is needless in any forum whose procedural rules permit the presentation in one action of all grounds for relief, whether legal or equitable, and whether the remedies sought are consistent or inconsistent." 1B J. Moore, Federal Practice ¶ 0.410[1] at 1160 (citations omitted). Moore relies in part on the reasoning of Judge Goodrich in *Williamson v. Columbia Gas & Electric Corp.,* 186 F.2d 464 (3d Cir.), *cert. denied,* 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355 (1951), which involved two suits brought in the federal district court in Delaware alleging substantially the same facts and involving the same parties, the only difference being that one invoked the Sherman Act and the other invoked the Clayton Act.

---

**20.** The court is, of course, aware of Service's somewhat disingenuous argument that even if they had sought to litigate their present theory during the first go-round with F.F., Judge Blair would certainly have bifurcated that issue along with the claim against Arnold because of their similarities. This argument is unpersuasive for two reasons. First, whether or not Judge Blair would have reached such a conclusion, counsel never gave him the opportunity because they did not present this theory at that time, nor at any time until filing the instant motion to amend, more than a year after the prior judgment. Second, it is by no means clear that Judge Blair would have taken the route counsel suggest. The distinction between the two situations is not one of substance but of judicial economy and convenience. It was possible, of course, if Service had prevailed against Aron, that no trial of the claim against Arnold would be *necessary,* hence bifurcation makes sense. The same cannot be said of F.F., however. F.F. was already in the case, both on the third-party claim in No. 77–1542 *and* as the declaratory judgment plaintiff in 77–2003, so no similar conservation of time and judicial resources would necessarily attend a bifurcation of part of Service's claim against F.F.

The suit based on the Clayton Act was dismissed on the merits, but the plaintiff contended that the first suit could still continue because the two causes of action were different. The court held that, as the wrongs alleged were practically the same in both suits, premising the suits on different statutes did not render the claims different "causes of action" for *res judicata* purposes:

The purpose of the principle of res judicata is to end litigation. The theory is that parties should not have to litigate issues which they have already litigated or had a reasonable opportunity to litigate.... A reading of the early cases as compared with recent ones makes it clear that the meaning of "cause of action" for res judicata purposes is much broader today than it was earlier. Formerly the whole aim in pleading, and in the elaborate system of writs, was to frame one single legal issue. That being the guiding principle, the phrase "cause of action" came to have a very narrow meaning. If the theory in the second suit was unavailable under the writ used in the first suit, the plaintiff had no opportunity to litigate it there and so plaintiff was not barred by res judicata. The force of the

rule is still operative but the scope of its operation has been greatly limited by the modernization of our procedure. *The principle which pervades the modern systems of pleading, especially the federal system, as exemplified by the free permissive joinder of claims, liberal amendment provisions, and compulsory counterclaims, is that the whole controversy between the parties may and often must be brought before the same court in the same action.* ...

... The plaintiff having alleged operative facts which state a cause of action because he tells of defendant's misconduct and his own harm has had his day in court. He does not get another day after the first lawsuit is concluded by giving a different reason than he gave in the first for recovery of damages for the same invasion of his rights. The problem of his rights against the defendant based upon the alleged wrongful acts is fully before the court whether all the reasons for recovery were stated to the court or not.

186 F.2d at 469–70 (emphasis supplied).

This "transactional" [21] approach has been adopted by the drafters of the Restatement

---

**21.** Chapter 3 of the Restatement 2d of Judgments (Tentative Draft No. 5, 1978) deals with issues of preclusion, and the drafters' note immediately preceding Title D of Topic 2 ("Personal Judgments") of that chapter provides in pertinent part:

The term "claim" (or the older cognate term "cause of action," see [§ ——] appears in a variety of contexts to refer to a unit of litigation, for example: in stating what a complaint should contain and correspondingly in stating the basis for a demurrer or motion to dismiss a complaint for legal insufficiency; in describing what are permissible amendments of the pleadings; in setting periods of limitations; in regulating the number of kinds of grievances that the parties may join in an action. The meaning or scope of claim is not necessarily the same in all the contexts. However, the "transactional" meaning or scope ascribed in this Restatement to claim for purposes of res judicata is not singular to that subject; it is a meaning that is being progressively ascribed to claim in a number of the contexts in which it appears in a modern system of procedure.
Comment a to § 61 goes on to explain:
a. *Rationale of a transactional view of claim.* In defining claim to embrace all the

remedial rights of the plaintiff against the defendant growing out of the relevant transaction (or series of connected transactions), this Section responds to modern procedural ideas which have found expression in the Federal Rules of Civil Procedure and other procedural systems.

\* \* \* \* \* \*

The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.
This definition of claim to engross the relevant transaction, as envisioned in this Topic, simplifies the application of the rules of merger and bar (see, for example, § 61.1, Comment a); it enhances the benefits deriving from those rules [see § ——] without causing undue hardship. Equating claim with transaction, however, is justified only

2d of Judgments § 61 *et seq.* (Tentative Draft No. 5, March 10, 1978):[22]

§ 61. Dimensions of "Claim" for Purposes of Merger or Bar—General Rule concerning "Splitting"

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 47, 48), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

The general rule of this Section is exemplified in § 61.1, and is subject to the exceptions stated in § 61.2.

§ 61.1. Exemplifications of General Rule Concerning Splitting

The rule of § 61 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action

(a) To present evidence or grounds or theories of the case not presented in the first action, or

(b) To seek remedies or forms of relief not demanded in the first action.

Comment c to § 61 clarifies the approach[23] of that section:

when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined. A modern procedural system does furnish such means. It permits the presentation in the action of all material relevant to the transaction without confinement to any single substantive theory or kind of relief and without regard to historical forms of action or distinctions between law and equity. A modern system allows allegations to be made in general form and reads them indulgently; it allows allegations to be mutually inconsistent subject to the pleader's duty to be truthful. It permits considerable freedom of amendment and is willing to tolerate changes of direction in the course of litigation. Parties can resort to compulsory processes besides private investigations to ascertain the facts surrounding the transaction, thereby measurably avoiding surprise at the trial. The pretrial conference contributes to the same end of developing the whole case. The law of res judicata now reflects the expectation that parties who are given the capacity to present their "entire controversies" shall in fact do so.

The developments here described should be seen in relation to modern liberal provisions as to counterclaims and joinder of claims and parties as well as the liberal attitude taken by federal courts toward "ancillary" and "pendent" jurisdiction. . . .

**22.** The language contained in both the text and comments to the provisions of the Restatement 2d of Judgments herein adverted to has remained unchanged from the first Tentative Draft (1973) to the fifth (1978).

**23.** The "pragmatic standard" espoused by the drafters of the new Restatement is explicated in Comment b to § 61:

b. *Transaction: application of a pragmatic standard.* The expression "transaction, or series of connected transactions", is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim.

It should be emphasized that the concept of a transaction is here used in the broad sense it has come to acquire in the interpretation of statutes and rules governing pleading and other aspects of civil procedure. Thus the overtones of voluntary interchange often associated with the term in normal speech do not obtain.

In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or

That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief.

### III

For these reasons, the drafters of the Restatement provided a separate exemplary section, § 61.1, *supra*, which appears particularly applicable to the facts herein. Thus in the trial of 77–1542, Service had to establish the existence of the F.F. insurance policy under which it claimed coverage. The history of the procurement of the F.F. policy is relevant for two reasons: first it demonstrates why Service believed itself covered (*i. e.* because the Home policy would have covered the loss to the coffee), and second, it places in relief the coverage *not* obtained from F.F. (although such coverage was available under a different F.F. policy), the contrast between the two kinds of policies supporting the conclusion that the policy actually procured did not cover the loss. Part and parcel of this "transaction" or set of operative facts was the investigation conducted by F.F. into the operations of Service, because F.F. surely would not have issued a policy to Service without first determining whether Service was an insurable risk. Of course, it is the fact of this investigation itself, combined with the availability of the proper coverage under a different F.F. policy, that is the core of the claim Service now seeks to bring, although the theory of liability this time has changed.

As explained in Comment d to § 61.1: Having been defeated on the merits in one action, a plaintiff sometimes attempts another action seeking the same or approximately the same relief but ad-

ducing a different substantive-law premise or ground. This does not constitute the presentation of a new claim when the new premise or ground is related to the same transaction or series of transactions, and accordingly the second action should be held barred.

Here again, Service's argument that, had they proceeded on their present theory, Judge Blair would not have permitted them to try it but would have left it for trial along with the bifurcated claim against Arnold, is unpersuasive. In the first place, Service never even gave Judge Blair the chance to make that decision but has instead sought to make that decision for him *nunc pro tunc.* More importantly, however, even if Service *had* proceeded on this theory and Judge Blair *had* reacted in the manner now divined by counsel's crystal ball, it would make no difference to the outcome of this case. Trial in 77–1542 was held in December of 1979, and judgment was rendered on February 5, 1980. Over a year passed between that result and the attempt by Service to amend its complaint against F.F. That Service was aware of the existence of this theory of recovery cannot be gainsaid, as it is the same theory of recovery on which Service is proceeding against Arnold.

As observed in the interpretation of § 61.1(a) contained in Comment b to that section:

A mere shift in the evidence offered to support a ground held unproved in a prior action will not suffice to make a new claim avoiding the preclusive effect of the judgment. It is immaterial that the plaintiff in the first action sought to prove the acts relied on in the second action and was not permitted to do so because they were not alleged in the complaint and an application to amend the complaint came too late.

Applying this reasoning by analogy to Service's position, even assuming that Service

---

proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held pre-

cluded. But the opposite does not hold true: even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series.

had tried to present its present theory before Judge Blair, it is clear that the "transaction" underlying the case is the same and the claim must be barred.

Accordingly, the court holds that the cause of action contemplated by the amendment sought by Service is barred by the principles of *res judicata*, and the motion to amend must therefore be denied.

The validity of this conclusion is buttressed by yet another factor. The same transactional approach discussed above is explicitly adopted by the Federal Rules of Civil Procedure with respect to counterclaims. Rule 13(a) regards any claim arising out of the transaction or occurrence that is the subject matter of the opposing party's claim as a compulsory counterclaim. "Although the rule does not explicitly so state, the effect of a defendant's failure to assert a counterclaim made compulsory by section (a) is to preclude its assertion in a later action against the former plaintiff." *Mesker Bros. Iron Co. v. Donata Corp.*, 401 F.2d 275 (4th Cir. 1968). The rationale behind the rule is easily understood as a mechanism to prevent duplication of time and effort by the parties and by the courts. As noted by one court, "Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and economy require that the counterclaimant be permitted to maintain his cause of action. Indeed the doctrine of *res judicata* compels the counterclaimant to assert his claim in the same suit for it would be barred if asserted separately, subsequently." *United Artists v. Masterpiece Productions*, 221 F.2d 213, 216 (2d Cir. 1955).

In 77–2003, F.F. sought a declaratory judgment that the policy issued to Service did not cover the loss of the coffee. Rule 13(a) demanded that Service assert its counterclaims arising out of the same transaction or occurrence in that suit at that time or forever abandon them. Accordingly, this court holds in the alternative that Service's failure to assert as a counterclaim

in 77–2003 the claim it now seeks to litigate by amendment to its third-party complaint in 77–1542 is barred by the application of Rule 13(a), and for this reason also the motion to amend must be denied.